**FRIENDS OF THE EARTH, INC.; Citizens Local Environmental Action Network, Inc.; and Sierra Club, Plaintiffs,**

v.

**LAIDLAW ENVIRONMENTAL SERVICES (TOC), INC., Defendant.**

Civil Action No. 3:92–1697–17.

United States District Court, D. South Carolina, Columbia Division.

Jan. 22, 1997.

Bruce J. Terris, Mark V. Dugan, Terris, Pravlik, & Wagner, Washington, DC, James Stuart Chandler, Jr., South Carolina Environmental Law Project, Pawleys Island, South Carolina, Robert Guild, Columbia, South Carolina, for plaintiffs.

Donald A. Cockrill, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, Georgia, Michael S. Thwaites, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, South Carolina, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This is an action brought pursuant to the citizen suit provision in Section 505 of the Federal Water Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act, 33 U.S.C. § 1365. In their amended complaint, plaintiffs, Friends of the Earth ("FOE") and Citizens Local Environ-

mental Action Network, Inc. ("CLEAN"), seek declaratory and injunctive relief, civil penalties, costs, and attorneys' fees from the defendant, Laidlaw Environmental Services (TOC), Inc. ("Laidlaw").

## I.

### INTRODUCTION

The Roebuck Plant and the 1987 Permit

Laidlaw owns and operates a hazardous waste incinerator located in Roebuck, South Carolina. As part of that facility, Laidlaw maintains a wastewater treatment plant for water used in air pollution control devices for the incinerator. Laidlaw discharges the treated wastewater into the North Tyger River pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit issued by the South Carolina Department of Health and Environmental Control ("DHEC").

Plaintiffs FOE and CLEAN initiated this action on June 12, 1992.[1] On July 1, 1992, Laidlaw moved to dismiss the plaintiffs' action, arguing that this citizen suit was barred by Section 505(b)(1)(B) of the Act, because DHEC had previously brought a lawsuit against Laidlaw for the same alleged violations of its permit. The plaintiffs responded by arguing that DHEC's lawsuit did not preclude the citizen suit because, *inter alia*, DHEC did not "diligently prosecute" its action against Laidlaw.

In its Order dated December 14, 1992, the court initially denied Laidlaw's Motion to Dismiss and ordered that an evidentiary hearing be held on the issue of whether plaintiffs' citizen suit could proceed. The court received a total of seven days of testimony on this matter in October, November, and December of 1993. In a subsequent memorandum opinion and order, this court held that DHEC's civil action against Laidlaw had not been diligently prosecuted and, as a result, allowed plaintiffs' lawsuit to proceed. *Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.,* 890 F.Supp. 470 (D.S.C.1995).

In May 1995, the parties filed cross-motions for summary judgment. In addition, Laidlaw, with support from various *amicus curiae,* requested that this court either reconsider its ruling that DHEC's prosecution was not diligent or certify this question to the Fourth Circuit Court of Appeals. On June 27, 1995, the court denied Laidlaw's Motion for Reconsideration or Certification, denied plaintiffs' Motion for Partial Summary Judgment and granted, in part, Laidlaw's Motion for Summary Judgment. As to Laidlaw's summary judgment motion, the court held that plaintiffs' allegations of effluent discharge violations other than mercury were barred under *Gwaltney v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), as they were not ongoing at the time the lawsuit was filed.

This court is authorized to decide this case on the merits pursuant to Section 505 of the Act, 33 U.S.C. § 1365. The court may use its equitable powers to enforce effluent standards or limitations and may impose an appropriate penalty, if any, in addition to the $100,000 penalty previously assessed against defendant in the DHEC lawsuit.

This case was tried before the court on July 31, 1995, through August 2, 1995. After the trial, this court held its decision in abeyance because a pending proceeding before a state Administrative Law Judge (regarding a change in the permit at issue in this case) could conceivably have an impact on this court's decision. When the ALJ's decision contained a finding that appeared to be at odds with some of the evidence in this case, this court, *sua sponte,* reopened the record in this case so as to receive additional evidence on what appears to be a critical issue. The parties engaged in brief discovery on this issue and then advised the court that it would not be necessary to conduct an additional evidentiary hearing because the discovery had resulted in a stipulation by the parties on this issue. Accordingly, the stipulation was added to the record in this case. *See* Stipulation and Order dated December 20, 1996.

---

**1.** At a hearing held on November 19, 1992, the Court granted plaintiffs' oral motion to join the Sierra Club as an additional plaintiff pursuant to Fed.R.Civ.P. 21.

After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## II.

### FINDINGS OF FACT [2]

The plaintiffs are non-profit corporations which bring this action on behalf of their members to protect their environmental, health, economic, recreational, and aesthetic interests in the quality of the North Tyger River and waters downstream.

The defendant is a South Carolina corporation which owns and operates a hazardous waste incinerator (hereinafter "the facility") in Roebuck, Spartanburg County, South Carolina. As part of the facility, Laidlaw operates a wastewater treatment plant to treat water from the air pollution control system which is associated with the incineration process. The treated wastewater is discharged into the North Tyger River.

Laidlaw purchased the facility from ABCO Industries, Inc. ("ABCO") in early 1986. During the balance of 1986, Laidlaw did not operate under its own NPDES permit; rather, the facility operated temporarily under the permit that had been issued to ABCO.

On December 15, 1986, pursuant to Section 402 of the Clean Water Act, 33 U.S.C. Section 1342, DHEC issued to Laidlaw NPDES Permit No. SC0040517, effective January 1, 1987 ("the 1987 Permit"), for the facility's wastewater treatment plant. The permit authorized Laidlaw to discharge limited quantities of pollutants into the North Tyger River in accordance with the conditions set forth in the permit. The permit limited Laidlaw's discharge of antimony, arsenic, cadmium, chromium, copper, lead, mercury, nickel, total organic carbon, total dissolved solids, total suspended solids, and zinc. The permit also regulated the flow, temperature, toxicity, and pH of the effluent from the facility. In addition, the permit imposed monitoring and reporting obligations, such as the requirement to maintain discharge monitoring reports ("DMRs") and laboratory reports.

Several of the effluent limits contained in Laidlaw's 1987 Permit were more stringent than those under ABCO's permit. The most significant reduction was in the mercury limit, which DHEC proposed to reduce from 20 parts per billion (ppb) under ABCO's permit to 1.3 ppb in the 1987 permit. The basis of this reduction was DHEC's use of the recently promulgated EPA 1986 Quality Criteria for Water, commonly referred to as the Gold Book.

Because Laidlaw's permit contained such a drastic reduction in the mercury limit, DHEC took two additional steps concerning the reduction. First, it imposed an interim limit of 10 ppb from January 1, 1987, to December 31, 1987. The limit decreased to 1.3 ppb on January 1, 1988. In connection with the interim limit, DHEC directed, in the permit, that Laidlaw conduct a feasibility study by March 31, 1987, of installed and available mercury removal systems to determine whether the mercury limit of 1.3 ppb could be satisfied.[3]

Second, DHEC included a reopener clause in the 1986 Permit that would have allowed Laidlaw to petition for a higher mercury limit once the company had investigated and installed the best available technology in the

**2.** Many of the preliminary findings of fact contained in this opinion have already been recited in the court's April 7, 1995 order allowing this suit to go forward. They are repeated here because they relate to the merits of the case as well.

**3.** The language of the 1987 Permit requiring a feasibility study reads as follows:

The Permittee shall conduct a study of installed and available mercury systems to determine the feasibility of achieving the mercury limit on

attempt to achieve 1.3 ppb.[4] The reason for including this reopener was that DHEC was uncertain whether any technology existed that would allow Laidlaw to comply with a daily maximum limit of 1.3 ppb.

In August 1986, prior to the issuance of a permit to Laidlaw by DHEC, Laidlaw contacted Environmental Technology Engineering, Inc. ("ETE"), an environmental consulting firm, for the purpose of conducting the above referenced feasibility study. This study was completed and submitted to DHEC in accordance with the permit. In this study, ETE concluded that removal of mercury to 1.3 ppb was an "extremely difficult and complex problem," inasmuch as all available manufacturer's information and reliable equipment on the market at that time demonstrated that current technology was capable of reducing mercury only down to a range of 2 ppb to 5 ppb.

As part of the feasibility study, ETE evaluated eight possible technologies, and ultimately narrowed the focus to two technologies, activated carbon and ion exchange, for bench and pilot scale testing. The actual testing of these technologies, which was done in accordance with accepted engineering practices, was conducted between June and December 1987.

Based on ETE's bench and pilot scale testing, the consulting firm concluded that a second carbon adsorption unit, to be run in series with Laidlaw's existing carbon unit, would enable Laidlaw to meet the 1.3 ppb mercury limit. Even though ETE's recommendations to this effect were not finalized until December, 1987, promising results of early testing of this technology motivated Laidlaw to begin work on the second carbon adsorption unit in 1987. Accordingly, Laidlaw received a permit for construction of the second carbon unit in February, 1987, and constructed the unit during the remainder of that year.

In early 1988, Laidlaw began operation of the second carbon adsorption unit. Because

of ETE's recommendation that this technology would enable Laidlaw to meet the 1.3 ppb mercury limit, Laidlaw chose not to exercise its option under the permit of petitioning for a higher mercury limit at that time.

Despite ETE's testing, the additional carbon unit did not allow Laidlaw's facility consistently to achieve the 1.3 ppb mercury limit. As a result, in September 1988, DHEC and Laidlaw entered into a consent order, in response to which Laidlaw contracted with RMT, Inc., a second environmental consulting firm, to fully re-evaluate the facility's wastewater treatment system and to make recommendations for correcting the problems Laidlaw was continuing to have with excursions of mercury and other metals. During the latter part of 1988, RMT investigated four conceptual approaches to treating the effluent from Laidlaw's facility. In December 1988, RMT submitted a preliminary engineering report to DHEC recommending the testing of three metals removal systems. These systems, trade named Unipure, Lancy and Memtek, each employed a different technology for metals removal.

During 1989, Laidlaw and RMT conducted bench and pilot testing on the Lancy, Unipure and Memtek wastewater treatment systems. The proposed schedule for completion of these studies was discussed with DHEC officials Mike Young and Andy Yasinsac. DHEC thereafter gave written approval of the pilot studies schedule. Also during 1989, Laidlaw applied for and received approval from DHEC to replace its two existing cooling towers with a single, more advanced cooling system. The purpose of this change was to eliminate occasional temperature excursions that Laidlaw experienced during the summer months.

On December 28, 1989, Laidlaw submitted the results of RMT's pilot testing to DHEC. Laidlaw, thereafter, selected the Lancy system and requested approval from DHEC for its installation. DHEC approved Laidlaw's

page 3 of this permit. A report of the study shall be submitted on March 31, 1987.

4. The "re-opener" clause of the 1987 Permit reads as follows:

Upon submittal of the report on mercury removal called for in the schedule of compliance and if requested by the Permittee, the mercury limit on page 3 of this permit may be reconsidered.

request and issued the required construction permit on July 10, 1990. The manufacturer of the Lancy system (U.S. Filter [5]) gave Laidlaw a conditional guarantee that the system would enable Laidlaw to comply with the mercury limit.

During the latter half of 1990 and the first two months of 1991, the Lancy system was constructed and installed at Laidlaw's facility. This installation work was performed in accordance with the compliance schedule submitted to and approved by DHEC. Between February and July, 1991, Laidlaw began full scale operation of the Lancy system and engaged in "debugging" activities related to its full implementation. During this period, all remaining pH problems were solved and the system effectively removed all metals to NPDES limits with the exception of mercury.

In responding to the continuing problems with mercury, Laidlaw worked both with DHEC and Lancy to make operational adjustments to the system in an effort to achieve compliance with the mercury limit. When it was ultimately determined that mercury excursions were continuing to occur, Laidlaw put pressure on U.S. Filter, the manufacturer of the Lancy system to correct the problem. U.S. Filter responded by recommending numerous testing procedures, including the addition of varying amounts of iron sulfate, copper sulfate, and free sulfide. These tests were unsuccessful, however, in reducing the mercury content below the NPDES limit. U.S. Filter thereafter determined that achieving the 1.3 ppb limit was problematic because it appeared that the level of metals being introduced to the wastewater treatment system was simply too low for the system to work effectively on mercury.[6]

Laidlaw eventually requested relief from the draconian limits of the 1987 Permit, but not until June 26, 1991, when it requested a higher site specific mercury limitation. The request was based on the proposition that the 1.3 ppb mercury limit was a water-quality based limitation that was not needed to meet the water-quality standards of the Tyger River. This request, therefore, was not made pursuant to the reopener clause of the 1987 Permit, which allowed for reconsideration of the mercury limit based on technology considerations. Laidlaw abandoned the June 26, 1991 water quality-based request after DHEC rejected the fish study that defendant had submitted in support of its request as inconclusive.

DHEC enforcement officials began preparation of a fact sheet to initiate enforcement action in early 1992, after a series of abnormally high mercury excursions occurred at the facility in December 1991. In May 1992, DHEC served a formal enforcement document on Laidlaw regarding the facility's continued mercury excursions.

On June 5, 1992, DHEC held an enforcement conference with Laidlaw. Subsequent meetings and telephone conferences to negotiate a consent agreement occurred later in the day on June 5, 1992, as well as on June 8, 1992. The parties reached a final consent agreement on June 9, 1992, and a judicial complaint was filed in the Court of Common Pleas in Spartanburg County, South Carolina on that date. On June 10, 1992, a state circuit judge approved the settlement of the DHEC lawsuit.

After the consent order was entered, Laidlaw continued to explore additional technologies to remedy its continuing mercury problems. Laidlaw experimented with various operational changes to the system and performed tests utilizing chemicals and technologies both recommended by its consultants and developed internally by Laidlaw personnel. As the mercury problems continued to be investigated, Laidlaw had to shut down the incinerator altogether for substantial periods of time in 1992, in an effort not to violate either its mercury parameter or the judicial consent order then in effect.

The solution to meeting the 1.3 ppb limit was ultimately achieved by Laidlaw person-

---

**5.** During the course of its dealings with Laidlaw, the vendor of the Lancy system has changed its name several times. The company is currently known as U.S. Filter. For ease of reference, that name is used throughout this opinion.

**6.** As discussed later in this section, the metal mix and total metal level impacts the effectiveness of the system due to certain chemical interactions.

nel through experimentation utilizing activated carbon, micro-filtration, and ion exchange. Laidlaw discovered, subsequent to June 1992, that adding activated carbon filters to the end of the Lancy system effectively reduced the mercury level below 1.3 ppb, so long as Laidlaw severely limited the feed rate of mercury containing waste into the incinerator.

Although it was initially believed that micro-filtration and ion exchange were necessary to sustain compliance with permit levels, testing revealed that these technologies did not improve the efficiency of mercury removal and they were ultimately abandoned. The addition of carbon adsorption technology to the end of the Lancy unit has enabled Laidlaw to consistently achieve compliance with all of the parameters contained in its NPDES permit, and, following an extended period of demonstrated full compliance, ·DHEC agreed to allow the judicial consent order to expire. DHEC so notified the state court in a letter dated August 6, 1993, from DHEC attorney William Ready to the Spartanburg, South Carolina Circuit Court. On August 17, 1993, the state court entered an order of final judgment bringing the state lawsuit to an end.

### The 1993 and 1994 Permits

On December 31, 1991, Laidlaw initiated efforts to renew the 1987 Permit and to amend the permit limit for mercury excursions. As a result of these efforts, DHEC issued a new permit ("the 1993 Permit") setting forth new and corrected permit limits for a number of constituents, including mercury.

Like the 1986 Permit, the 1993 Permit contained only a daily limit, not a monthly average, for mercury. Laidlaw appealed the conditions of the 1993 Permit, contending that the limits in the permit had been calculated incorrectly. DHEC thereupon agreed to reissue the permit (now known as the 1994 Permit) so as to provide a new daily maximum of 10 ppb and a monthly average of 1.25 ppb for mercury. The reason for two permit limits is that the Clean Water Act regulations had been amended since the 1987 Permit was issued so as to require that NPDES permits address both the acute (short term) and chronic (long term) impacts of discharges on the receiving water body. This is accomplished by a daily maximum [7] limit (to control the acute impact) and a monthly average [8] limit (to control the chronic impact). DHEC records show that the daily maximum *could have* been set as high as 200 ppb under the EPA Gold Book criteria, but DHEC set the limit at 10 ppb based on Laidlaw's previously demonstrated ability to achieve such a limit.

The 1994 Permit, therefore, significantly altered Laidlaw's discharge obligations in two respects: it established a monthly average where none had existed before, and it increased the daily maximum to more than seven times what it had been previously.

FOE and CLEAN challenged DHEC's relaxing of the permit limits, filing a Petition for Administrative Review with Chief Administrative Law Judge Marvin F. Kittrell. In their appeal, the petitioners alleged that the daily maximum limit for mercury in the 1994 Permit violated the general "anti-backsliding" [9] rule because the limit was higher than the limit in Laidlaw's 1987 Permit. The appeal to Judge Kittrell was pending when this court conducted its July 1995 trial.

Because a final decision on the new permit could possibly impact on the remedial aspects of this case, the court announced at the conclusion of the July 1995 trial that it would reserve final judgment on the merits of this case until Judge Kittrell decided the appeal.

7. A daily maximum limit is, as the term suggests, the maximum amount permitted on a given day.

8. The term "monthly average" is somewhat misleading. A monthly average of a substance reflects the average amount of the substance discharged per day, based on an average of measurements taken for that substance over the course of a month.

9. Backsliding means the issuing of a permit with less stringent limits than the limits imposed by a previous permit. There are several federal and state regulations prohibiting backsliding, *e.g.* 40 C.F.R. § 122.44(*1*) (1994); S.C.Code Regs. 61–9.122.44(*1*) (Supp.1995), and there are several exceptions to the anti-backsliding rules. These exceptions are set forth in detail in the ALJ's order.

On January 25, 1996, Judge Kittrell upheld the 1994 Permit, thus approving the higher limits for mercury. In doing so, Judge Kittrell found that several exceptions to the anti-backsliding rule had been demonstrated.

On May 9, 1996, Judge Kittrell's decision was affirmed by the DHEC Board by a 4–3 vote. The plaintiffs have appealed the DHEC decision to the South Carolina Circuit (trial) court, and have indicated they will, if necessary, appeal to the South Carolina Supreme Court.[10]

Not surprisingly, the parties disagree over whether certain findings by Judge Kittrell are binding on this court. Laidlaw argues that this court is bound by certain factual findings made by Judge Kittrell and relied upon by him in approving the higher limits. Plaintiffs contend that this court is not bound by these findings, relying primarily upon the argument that the issues before Judge Kittrell were different. Plaintiffs also argue that some of the factual findings on which Laidlaw relies were not necessary to support Judge Kittrell's decision, which ultimately rested on several different legal theories.

This court need not wade into this thicket. With regard to two of Judge Kittrell's findings relied upon by the defendant (Laidlaw's good faith and lack of harm to the environment), the record before this court leads to findings not inconsistent with those of Judge Kittrell. Accordingly, as to these two issues this court will make its own findings, on the record before it, without affording collateral estoppel effect to the findings of the Administrative Law Judge.

The third component of Judge Kittrell's order that Laidlaw seeks to rely upon in this case relates to the finding that the 1993 Permit erroneously used the chronic value for mercury contained in the EPA Gold Book to derive a daily maximum, or acute, limitation. This error was corrected when the 1994 Permit was issued by DHEC: the Gold Book acute and chronic values were used to establish daily maximum and monthly average mercury discharge limits. Judge Kittrell agreed with Laidlaw that the 1993 Permit

was issued in error and that the 1994 Permit corrected the problem.

In this case, Laidlaw seeks to build upon Judge Kittrell's finding that the 1993 Permit was issued incorrectly. Laidlaw seeks to have this court conclude that the 1987 Permit was issued incorrectly for the same reasons the 1993 Permit was issued incorrectly. That is to say, DHEC misapplied the Gold Book in Laidlaw's 1986 Permit by deriving the daily maximum limit from the chronic rather than the acute value for mercury.

▪ Laidlaw's argument in this regard fails for two reasons. First, it is well-settled that a NPDES permit holder may not challenge the validity of the permit in an enforcement proceeding. Section 509(b)(2) provides that the terms of a permit "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." 33 U.S.C. § 1369(b)(2). This section, therefore, prohibits this court from considering whether defendant's 1.3 ppb maximum mercury limitation is erroneous in terms of the liability to be found. In enacting this section, Congress intended to preclude untimely challenges to permit requirements in enforcement proceedings. The Senate Report stated:

> An alleged violation of an effluent control limitation or standard, would not require reanalysis of technological [or] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision.
>
> \* \* \* \* \* \*
>
> Consequently, the factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issue before the courts would be a factual one of whether there had been compliance.

S.Rep. No. 414, 92d Cong., 1st Sess. 79–80 (1971), reprinted in A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess., vol. 2

---

**10.** The new permit limits went into effect on June 1, 1996 and will remain in effect unless plaintiffs are able to convince a circuit judge to award them temporary injunctive relief pending resolution of their appeal.

(1973) (hereafter "Legis.Hist."), pp. 1497–1498, also reprinted in 1972 U.S.Code Cong. & Ad.News 3668, 3745–3746.

The Senate Report also stated:

One purpose of these new requirements is to avoid the necessity of lengthy fact finding, investigations and negotiations at the time of enforcement. * * * [T]he threat of sanction must be real, and enforcement provisions must be swift and direct.

S.Rep. No. 414, *supra,* pp. 64–65, 2 Legis.Hist. at 1482–1483, 1972 U.S.Code Cong. & Ad.News at 3730–3731.

Defendant's remedy, if it believed that its 1987 Permit was invalid for any reason, was to seek an administrative adjudication pursuant to South Carolina law. South Carolina law provided defendant with the opportunity to challenge its permit in an administrative proceeding (S.C.Code of Laws, Volume 25, Regulation 61–72) and to have the administrative determination reviewed by a state court (S.C.Code Ann. § 1–23–380 (Law.Coop.1995)). Defendant never pursued this remedy.

■ The second reason that Judge Kittrell's analysis of the 1993 Permit does not impact upon the 1987 Permit lies in the fact that, as Judge Kittrell himself acknowledged, DHEC was under no legal obligation to establish a monthly average limitation in the 1987 Permit, or even to use the Gold Book's acute value for mercury to establish a daily maximum limit. This is, quite simply, because the regulations governing such permits were different in 1986.

The decision by Judge Kittrell to approve a monthly average and a higher daily maximum for the renewed permit does, however, have significant ramifications for this case. First, the new limits are important in determining whether any injunctive relief should be awarded. Second, the fact that the daily maximum (10 ppb) is now over seven times the old 1.3 ppb limit of the 1987 Permit (and indeed could have been as high as 200 ppb but for Laidlaw's demonstrated ability to reduce its mercury effluent to levels substantially below 200 ppb) will impact on the penalty imposed in this case.

### Laidlaw's Compliance Efforts

■ Regarding the issue of good faith compliance, plaintiffs contend that Laidlaw did not act in good faith in obtaining adequate pollution control equipment and failed to exercise proper operational controls during the time that the mercury excursions were occurring. Plaintiffs contend that Laidlaw should have purchased the Memtek System rather than the Lancy Wastewater Treatment System. They argue that Lancy was selected because it was less expensive than Memtek and they also point out that Memtek was willing to provide a stronger guarantee regarding the mercury limit. Plaintiffs also contend that Laidlaw could have simply restricted its feed rate of mercury in order to achieve compliance with the 1.3 ppb limit and that, by not so doing, demonstrated a disregard for its permit limits.

Although the facts in this case disclosed that Lancy was somewhat less expensive than Memtek and its guarantee was somewhat more conditional than Memtek's guarantee, the court determines that the decision to purchase the Lancy system was reasonable under the circumstances. Specifically, DHEC was involved with Laidlaw and its consultants in the process of developing and approving the Lancy treatment technology and both Laidlaw and the manufacturer of the Lancy system (U.S. Filter) believed that the treatment technology employed would be sufficient to meet the 1.3 ppb limit.

Memtek guaranteed that its system would allow Laidlaw to comply with the 1.3 ppb mercury limit. U.S. Filter initially guaranteed that the Lancy system would allow Laidlaw to comply with "most" of its permit limits. However, U.S. Filter told Laidlaw that "[w]hile the pilot tests results on mercury removal were encouraging, the limit is so low that we cannot at this time guarantee that the 1.3 ppb limit can be met." After additional treatability studies, U.S. Filter provided a conditional guarantee that the Lancy system would enable Laidlaw to comply with the mercury limit. *See* Stipulation and Order dated December 20, 1996.

This guarantee was tied to four operating conditions. Laidlaw clearly met the first three conditions. The fourth operating con-

dition stated that the addition of metals/salts "may be beneficial to the [mercury] removal process." In other words, the conditional guarantee required that non-mercury metals might have to be added to the wastewater to ensure that the balance between mercury and non-mercury metals was at the level necessary to obtain optimal mercury removal by the Lancy system. The reason that there must be a balance between the mercury and non-mercury metals is that if there is not a sufficient level of non-mercury metals in the wastewater to react with the sodium sulfide that is added to the wastewater as part of the treatment process, then the mercury will remain in a soluble form that is not filtered out of the wastewater by the Lancy system. Instead, the mercury is discharged in the effluent. If there is a sufficient level of non-mercury metals to react with the sodium sulfide, the mercury becomes insoluble and is filtered out of the wastewater.

Shortly after the Lancy system was installed on March 15, 1991, Laidlaw began experiencing problems with meeting its mercury limitation. U.S. Filter first recommended adding iron to its wastewater. After receiving approval from DHEC, Laidlaw added iron, which ultimately proved unsuccessful in bringing about compliance.

In July 1991, U.S. Filter recommended adding copper to the wastewater. DHEC initially refused to allow this addition. After additional discussions, however, DHEC approval was obtained, and copper was added. This also proved unsuccessful.

The solution to meeting the 1.3 ppb limit was ultimately achieved by Laidlaw personnel through experimentation using additional treatment technologies. Laidlaw discovered, subsequent to June 1992, that adding activated carbon filters to the end of the Lancy

system effectively reduced the mercury level below 1.3 ppb, so long as Laidlaw severely restricted the feed rate of mercury-containing waste into the incinerator.

Under these facts, this court finds that Laidlaw acted reasonably in selecting the Lancy system and bringing it on-line.

■ The second issue regarding good faith compliance relates to plaintiffs' contention that Laidlaw could have resolved mercury excursions by simply restricting the feed rate of mercury-containing waste into the incinerator. On the record before it, however, the court determines that there is no simple linear relationship between the amount of mercury in the feed-rate and the amount of mercury in the effluent.

Thus, the court determines that Laidlaw acted in good faith once it decided to bring the Lancy system on-line. It must be remembered, however, that the court has already determined that the Lancy system should have been selected and installed sooner than it was. *Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.*, 890 F.Supp. at 483. This court's finding in this regard predated the decision of ALJ Kittrell. Thus, there can be no argument that the court is bound by the ALJ's finding in this respect.

This court's finding of good faith on the part of Laidlaw in regard to the installation of the Lancy system is, therefore, tempered by the fact that Laidlaw waited longer than it should have to install the system.[11] Additionally, this court has previously determined that other mercury removal equipment that the defendant installed in 1992 and 1993 should have also been brought on-line by January 1, 1988.[12]

---

**11.** For reasons discussed later in this order, this court has, however, determined that the on-line date should be January 1, 1988, rather than January 1, 1987.

**12.** The conditional guarantee issued by U.S. Filter was the reason the court reopened the record subsequent to the ALJ decision. When the record closed in this case on August 2, 1995, the only documents in the record indicated that U.S. Filter would guarantee the Lancy system would meet all of the permit requirements except for mercury. The ALJ, on the other hand, determined that U.S. Filter guaranteed that Lancy would meet *all* permit requirements. This led to this court's decision to reopen the record. As noted previously, the parties engaged in discovery and then submitted a stipulation to the court regarding the nature of the U.S. Filter guarantee. The court views the new evidence brought into this case by way of the stipulation to be significant, because the record had theretofore indicated that U.S. Filter specifically excluded mercury from its guarantee. As indicated in the body of this opinion, although U.S. Filter initially includ-

## Harm to the Environment

Laidlaw introduced the results of its nine years of semiannual acute and chronic toxicity tests, the results of the fish tissue study conducted by RMT on bluegill sunfish from the North Tyger River, and the results of the subsequent fish tissue study conducted by DHEC on large mouth bass and other species of fish in the river. Based on these tests, the supporting testimony of Laidlaw's expert witness Dr. Sam White, and the testimony of various DHEC witnesses, this court finds that the water quality standard for mercury is currently being attained in the North Tyger River and that the overall quality of the river exceeds levels necessary to support propagation of fish, shellfish, and wildlife, and recreation in and on the water.

The fish tissue studies performed by RMT and DHEC both showed levels of mercury in the sampled fish well below the Food and Drug Administration (FDA) action level of 1.0 milligram per kilogram of fish tissue examined. In fact, the DHEC fish study showed no mercury above its detection limit of 0.25 mg/kg, less than one quarter of the level necessary to trigger the FDA action level.

Laidlaw's macroinvertebrate assessments, which were performed two times per year between 1986 and 1994, and 96–hour flow-through bioassays, which were also performed during this same time period, showed that prior mercury discharge limits as high as 20 ppb had no adverse effect on the indigenous biological community in the North Tyger River downstream from Laidlaw's facility. Thus, there has been no showing of any significant harm to the environment in this case.

### Permit Violations

#### 1. Mercury Exceedances

Laidlaw has violated the daily maximum mercury limitations of the 1987 Permit a total of 489 times. Laidlaw does not dispute these mercury exceedances, which are summarized on the following table: [13]

## DISCHARGES IN VIOLATION OF PERMIT

| YEAR | 1% to 100% over permit level | 101 to 400% over permit level | 401 to 1000% over permit level | more than 1000% over permit level | Total number of violations |
|------|------|------|------|------|------|
| 1987 | 11 | 2 | — | — | 13 |
| 1988 | 29 | 22 | 11 | 6 | 68 |
| 1989 | 30 | 28 | 1 | 1 | 60 |
| 1990 | 28 | 20 | 5 | 3 | 56 |
| 1991 | 91 | 60 | 10 | 5 | 166 |
| 1992 | 51 | 60 | 8 | 4 | 123 |
| 1993 | 1 | — | — | — | 1 |
| 1994 | — | 1 | — | — | 1 |
| 1995 | 1 | — | — | — | 1 |
| TOTAL | 242 | 193 | 35 | 19 | 489 |

As can be seen from the table above, most of the exceedances occurred prior to mid–1992, while Laidlaw was experimenting with various technologies to bring the plant into compliance. Only nine of the exceedances occurred after June 1992.

ed such a disclaimer, subsequent negotiations between the parties led to the conditional guarantee upon which the ALJ's finding of good faith was based.

#### 2. Monitoring and Reporting Violations

Laidlaw has committed 420 violations of the monitoring requirements of the permit and 503 violations of the reporting requirements. These violations are summarized on

13. A more detailed table of the mercury exceedances between 1986 and 1995 is attached to this order as Appendix A.

Plaintiff's Revised Exhibits 77–79, and 97, and 95 Tr. 181–82, 187.

There is a degree of overlap in these calculations, however, because the monitoring violations are also considered reporting violations.[14] There have been 10 reporting requirements violations and 13 monitoring requirements violations since the complaint in this action was filed in June 1992.

A significant number of the reporting and monitoring violations concern technical errors on the forms used by Laidlaw to report its compliance to DHEC. Some of the other monitoring violations relate to things such as the method of sampling used ("grab sample" vs. continuous sampling), the detection level of the mercury monitoring equipment (to a level of 2.0 ppb rather than 1.3 ppb), days where no sample was received for metals, and instances where chemical inhibitions or interferences existed in the wastewater effluent samples, which prevented mercury detection below 2.0 ppb.

## CONCLUSIONS OF LAW

### *Appropriate Relief*

This court has jurisdiction over the parties to this action and the subject matter of this action.

#### 1. *Civil Penalty*

■ When a violation of the Act is established, a civil penalty is mandated by Section 309(d) of the Act, 33 U.S.C. § 1319(d). *Stoddard v. Western Carolina Regional Sewer Authority,* 784 F.2d 1200, 1208 (4th Cir. 1986). Section 505(a) of the Act, 33 U.S.C. § 1365(a), authorizes this court to assess "any appropriate civil penalties under Section 309(d) of [the] Act." Prior to its amendment in 1987, Section 309(d), 33 U.S.C. § 1319(d), provided for a civil penalty not to exceed $10,000 per day of violation. In 1987, Congress increased the statutory maximum penalty to $25,000 per day. 101 Stat. 45 (1987).

Pursuant to Section 309(d) of the Clean Water Act, the court is directed to consider the following six factors in determining

whether a civil penalty should be assessed in addition to the $100,000 penalty Laidlaw has already paid: (1) the seriousness of the violation or violations; (2) the economic benefit (if any) resulting from the violations; (3) any history of such violations; (4) the defendant's good faith efforts to comply with the applicable requirements; (5) the economic impact of the penalty on the defendant; and (6) such other matters as justice may require.

#### (a) Seriousness of Violations

Mercury is an extremely toxic pollutant. Mercury can take various forms, including elemental mercury, inorganic mercury, and organic mercury. Organic mercury, or methylmercury, is the most toxic. While most of the mercury that Laidlaw discharges is in the inorganic form, inorganic mercury can methylate, or take its organic form, in sediments, water, or fish tissue.

■ Preliminarily, the court confirms its ruling at trial sustaining the objection of Laidlaw to certain exhibits proffered by the plaintiffs (Trial Transcript 1 at 67). Plaintiffs attempted to introduce the EPA's March 1995 Interim Clean Water Act Settlement Penalty Policy. This policy includes, among other considerations, a "gravity component" that employs the use of various factors and considerations in arriving at this particular portion of the penalty. As pointed out by Laidlaw, the policy expressly states that it is not to be used by a court in determining a penalty at a trial. Inasmuch as plaintiffs have not articulated any reason why this court should ignore the plain language of the policy, it will not be considered in arriving at an appropriate penalty amount. The same is true of plaintiffs' Exhibit 133 setting forth the actual calculations made by the plaintiffs applying the factors set forth in the EPA penalty policy.

The court does consider the plaintiffs' selection of a value range of 1–10 under gravity factor B to be probative, however. Gravity factor B involves consideration of health and environmental harm in setting a penalty and, pursuant to the EPA's penalty policy, there

---

**14.** Of the 503 reporting violations, 305 involve failure to report discharge violations (as opposed to monitoring violations) properly.

are four possible value ranges: 10–50, 1–10, 4–50, and 2–25. The value range of 1–10 selected by the plaintiffs is clearly the range that is indicative of the least amount of health or environmental harm. In fact, the use of this particular value range simply indicates that a water quality-based effluent standard was exceeded and not that any health or environmental harm resulted from that exceedance. In cases where there is an impact on human health, the penalty policy provides a value range of 10–50. Similarly, where there is a fish kill, beach closing, or restrictions on the use of a water body, a value range of 4–50 is indicated. Where there is some other type of impact on the aquatic environment, the appropriate value range is 2–25. The plaintiffs' use of the 1–10 value range constitutes an acknowledgment that the NPDES permit violations at issue in this citizen suit did not result in any health risk or environmental harm.

■ Concerning the monitoring and reporting violations, the court recognizes that it has been held that such violations can be considered "serious." In *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109 (4th Cir.1988), the court held that monitoring and reporting violations were serious where the defendant both failed to file any discharge monitoring reports (DMRs) at all for over two and one-half years and further had not even installed monitoring equipment that would have permitted it to comply with its monitoring and reporting obligations. In the case at bar, the monitoring and reporting violations proven to have occurred were a combination of anomalies interfering with properly installed detection equipment, instances where the detection equipment malfunctioned, and technical errors on reporting forms that even DHEC recognizes were a result of confusion as to how to properly complete the forms. These deficiencies were not the result of a failure either to install proper monitoring equipment or to submit timely DMRs.

■ As the court held in *PIRG v. Yates Industries*, 757 F.Supp. 438, 454 (D.N.J. 1991): "Reporting deficiencies do not produce the type of direct environmental impact which is the primary purpose behind the act." Moreover, monitoring violations are not considered serious unless they are found to have been in bad faith. *PIRG v. Elf Atochem North America, Inc.*, 36 Env't Rep. Cas. (BNA) 1855, 1867, 817 F.Supp. 1164 (D.N.J.1993).

In this case, Laidlaw's monitoring and reporting deficiencies, all of which have long since been resolved, produced no direct environmental impact. There has been no demonstrated proof of harm to the environment. Moreover, DHEC was made aware on a continuous basis of the compliance problems Laidlaw was experiencing. An open line of communication between Laidlaw and DHEC existed throughout the time period relevant to this litigation. Further, DHEC's knowledge of these problems, its enforcement efforts with respect thereto, and the agency's continued involvement with Laidlaw in achieving a solution to these problems have resulted in Laidlaw's ultimate compliance with its NPDES permit over an extended period of time. Those monitoring and reporting violations that are technical in nature were not shown to have been a product of bad faith and did not result in DHEC's being mislead or ignorant as to the type or extent of compliance difficulties Laidlaw was experiencing. On this record, the monitoring and reporting violations cannot be said to have constituted "serious" violations of the Act.

■ The presence or absence of environmental harm is relevant to the assessment of a Clean Water Act penalty. In *Hawaii's 1000 Friends v. City and County of Honolulu*, 821 F.Supp. 1368 (D.Haw.1993), the court was faced with conflicting data regarding whether defendants' Clean Water Act violations had caused environmental harm. The court concluded that this conflicting evidence was insufficient to demonstrate that harm had actually occurred, and held "the lack of [demonstrated] material harm to be a *significant* mitigating factor in assessing penalties." 821 F.Supp. at 1395–96. (emphasis added).

The same is true in this case. All available data, including semi-annual acute and chronic toxicity tests performed by Laidlaw over the last nine years, a 1992 fish tissue study conducted by RMT, and a recent fish tissue

study conducted by DHEC, fail to show that Laidlaw's *actual* discharges have resulted in harm to the North Tyger River.

Plaintiffs' primary argument regarding this issue centers on the fish tissue study conducted by RMT in 1992. It is plaintiffs' position that this test is inconclusive because it was performed on bluegill sunfish rather than large mouth bass. That study found no fish with mercury bioaccumulation greater than 0.14 ppm, which is over seven times lower than the FDA action level of 1.0 ppm. Plaintiffs' expert, Dr. Weiss, looked at a DHEC fish tissue study performed on large mouth bass from an unconnected South Carolina body of water known as the Langley Pond, and extrapolated these results to conclude that large mouth bass in the North Tyger River would exceed the FDA action limit for mercury.

The DHEC study of large mouth bass in the North Tyger River refutes the conclusion of Dr. Weiss. This study, using detection equipment measuring mercury bioaccumulation at .25 ppm and higher, detected no mercury in any fish, large mouth bass included, that were analyzed from the North Tyger River.

This test is particularly significant. According to Dr. Sam White, the FDA action level of 1.0 ppm was established conservatively to protect human health. Protecting fish, on the other hand, would result in a number hundreds of times higher than 1.0 ppm. The FDA action level was derived from studies of inhabitants of countries where fish are consumed frequently around the world, for example Japan, where it was discovered that no adverse symptoms occur in humans unless the blood level of mercury reaches 200 ppm or greater. In establishing the FDA limit, this minimum symptom threshold was reduced 10 times for safety, and, after being further reduced by other factors, the 1.0 ppm number was derived.

DHEC's North Tyger River study shows that no fish in that river has a mercury level even one-quarter of a limit that is ten times lower than necessary to protect human health. This test result, considered together with the nine years of acute and chronic toxicity testing data as to the effect of Laid-

law's total effluent on all other aspects of the stream, leads the court to conclude that Laidlaw's effluent, even with the permit exceedances it has experienced, has had no demonstrated adverse affect on the environment.

(b) Economic Benefit of Non–Compliance

As this court held in its April 7, 1995 Order, the capital asset pricing model using an interest rate of 15.25% is the preferred method of calculating the economic benefit, if any, of non-compliance. Using this methodology, plaintiffs' economic expert, Dr. Michael Kavanaugh, calculated Laidlaw's economic benefit of non-compliance at $3,139,418.00. Laidlaw's economic expert, Robert Fuhrman calculated the economic benefit at $884,797.00. The court finds the economic benefit of non-compliance to be $1,092,581. In so doing, the court adopts most, but not all, of Mr. Fuhrman's analysis.

Preliminarily, the court notes that both experts' calculations involved two types of expenditures: penalty items and credit items. Penalty items involve delayed expenditures that were necessary to bring the facility into compliance with its NPDES permit. Credit items represent expenditures that were either not necessary for compliance or were made because the penalty item equipment was not in place.

The first penalty item set forth in Table 1 of Mr. Fuhrman's report is the neutralization system. Mr. Fuhrman calculates an economic benefit of $303,276 based on a non-compliance date of January 1, 1988. Dr. Kavanaugh, on the other hand, calculates an economic benefit of $675,431 based on a compliance date of January 1, 1987. Mr. Fuhrman performed an alternative calculation using the January 1, 1987 non-compliance date and arrived at the same figure as Mr. Kavanaugh—*i.e.,* $675,431. Inasmuch as the NPDES permit in question was not issued by DHEC until December 1986, and considering the fact that Laidlaw was given until March 31, 1987 to issue a preliminary feasibility report on achieving the new mercury standard, the court finds that January 1, 1988 is a more realistic and appropriate non-compli-

ance date and thereby adopts Mr. Fuhrman's calculation of $303,276.

The next penalty item is the Lancy system. Mr. Fuhrman calculates an economic benefit of $1,744,000 based on a non-compliance date of January 1, 1988. Dr. Kavanaugh on the other hand calculates an economic benefit of $2,452,000 using a non-compliance date of January 1, 1987. Mr. Fuhrman presented an alternative calculation to the court using the January 1, 1987 non-compliance date that agrees with Dr. Kavanaugh's calculation. Thus, the only difference between the parties on this particular penalty item is the non-compliance date. For the reasons stated in the immediately preceding paragraph, the court finds that the January 1, 1988 non-compliance date is more appropriate.[15]

Fortunately, the parties are in accord on a number of penalty items: pre-filter ($71,806), gas scrubber study ($15,824), wastewater study ($25,164), ISCO Sampler ($4,856), and miscellaneous one-time expenses ($40,810). The Court agrees and adopts these figures.

 As to the credit items, there is sharp disagreement between the parties on several issues. Laidlaw's facility manager, Dale Fentress, testified without contradiction that the ion exchange system and micro-filter piping apparatus are not being operated as part of the facility's wastewater treatment system and in fact were never used on a regular basis. Specifically, Mr. Fentress testified that after the equipment was purchased and installed in 1993, subsequent testing demonstrated that the ion exchange and micro-filter piping equipment were ineffective in further lowering the mercury content of Laidlaw's effluent. In fact, the last time the equipment was used was in November 1994. While plaintiffs' wastewater treatment expert, Dr. Bruce Bell, testified that, in his opinion, Laidlaw did not adequately test the ion exchange and microfiltration equipment, the undisputed fact remains that the equipment has not and is not being used and was, therefore, unnecessary for compliance. Since, as noted *supra*, penalty items by definition must be necessary for compliance, the ion exchange and micro-filter systems are not penalty items.

The court finds that Laidlaw purchased the ion exchange and microfiltration systems as part of a reasonable effort to achieve compliance with the very stringent 1.3 ppb mercury limit but that this equipment was ultimately not necessary to achieve compliance.[16] In other words, Laidlaw spent its money unnecessarily. That raises the important issue of whether the purchase of this unnecessary equipment should be treated as a credit item. Mr. Fuhrman computes a credit of $48,584 and $21,100, respectively, for the ion exchange system and the micro-filter piping. Dr. Kavanaugh, on the other hand, would not extend any credit for the purchase of these two items. He testified that as far as economic benefit is concerned, his analysis treats a willful polluter, who knows what equipment is necessary for compliance but refrains from purchasing it, and a "good faith" polluter, who makes a good faith effort to maintain compliance, the same way. The court adopts Laidlaw's position on this issue. As Dr. Kavanaugh conceded on cross-examination, EPA's policy as set forth in the BEN User's Guide is to allow credits when a company, acting upon the reasonable advice of a competent consultant, purchases equipment that ultimately proves unsuccessful in

15. The court's April 7, 1995 order found that the Lancy system should have been installed by January 1, 1987. 890 F.Supp. at 483. Laidlaw subsequently moved to reconsider this finding, supporting its motion with a detailed time line. The court has become convinced that its earlier finding in this regard was in error. The April 7, 1995 order is therefore modified so as to provide that the Lancy system should have been brought on-line by January 1, 1988.

16. Plaintiffs contend that this court has already made a finding that the ion exchange and micro-filter systems were needed and should have been installed by January 1, 1988. In its April 7 order, the court determined that "[a]ll of the mercury removal equipment that the Defendant installed in 1992 and 1993 was necessary to ensure compliance with the 1.3 ppb mercury limit," 890 F.Supp. at 484. In a strict sense, this finding includes the ion exchange and micro-filter systems. The evidence regarding these two systems, however, was not as fully developed at the earlier hearing. During the July–August 1995 trial, it became clear that this equipment ultimately was not necessary to achieve compliance. The court therefore modifies the April 7, 1995 order to this extent.

achieving permit compliance. The court finds this to be a reasonable and fair policy. Dr. Kavanaugh explained that he does not give a credit for unsuccessful equipment purchases because he feels that the purchasing company (in this case, Laidlaw) can seek legal redress from either the manufacturer of the equipment or the engineering consultant who recommended its purchase. The court finds this viewpoint impracticable. Obviously, absent an express warranty to the contrary, non-defective equipment purchased upon a reasonable and non-negligent recommendation can nonetheless fail to meet a specified objective—in this case compliance with the 1.3 ppb mercury limit.

Applying similar reasoning, the court finds that Mr. Fuhrman's credit of $23,485 for micro-filter rental is appropriate and rejects plaintiff's contention that this good faith rental of unsuccessful equipment should not be counted as a credit item.

The next credit item is the rental of the ISCO Sampler for which Mr. Fuhrman calculates a credit of $5,529. As shown by Plaintiffs' Exhibit 148, Dr. Kavanaugh agrees with this calculation and makes no adjustment to it. Accordingly, the Court will extend a credit of $5,529 for rental of this equipment.

■ Mr. Fuhrman calculated credits for the next three items, i.e., rental carbon adsorption, 1992 wastewater disposal, and fish tissue study, of $21,332, $24,009, and $18,154, respectively. Dr. Kavanaugh would not extend any credit for these items. The court agrees with Mr. Fuhrman. It must be remembered that Laidlaw is being penalized through the calculation of an economic benefit for delayed expenditures that were necessary for permit compliance. It is undisputed that if these penalty item expenditures had been timely made, Laidlaw would have been in compliance and it would have been unnecessary to spend money on the three credit items at issue. It would be unfair to impose a penalty upon Laidlaw for equipment that it purchased too late while at the same time not extending a credit for expenditures that clearly would not have been made if those purchases had been timely.

The next credit item is operations and maintenance (O & M) cost. Defendant's Ex-

hibit 245 sets forth the total O & M cost at the facility during the time period of 1988 through 1992. Mr. Fuhrman testified that from this list he selected for a credit those expenditures that would not have been made if Laidlaw had been in compliance with its NPDES mercury limit in a timely fashion. Those items selected for a credit from Defendant's Exhibit 245 are set forth at page 19 of Mr. Fuhrman's July 24, 1995 report. For example, in 1988, Laidlaw spent $139,307.04 for caustic that it would not have spent had its new pH neutralization system been installed on January 1, 1988. As noted *supra,* Laidlaw is being penalized for the delayed purchase of this system. Given that fact, it is proper that Laidlaw be entitled to a credit for money that it spent in 1988 since this expenditure would have been unnecessary had the neutralization system been in place on January 1, 1988. Mr. Fuhrman's credit of $401,759 is adopted.

■ The largest credit item involves lost earnings from the voluntary shutdown of the Roebuck incinerator due to Laidlaw's inability to comply with the mercury permit limit. These occurred in June and July of 1992. Mr. Fuhrman calculated that these lost earnings totalled $831,136. To arrive at this figure, he looked at average earnings before interest and taxes of the facility during fiscal year 1992 (August 1991 to September 1992). During this time there was a shutdown of approximately twenty (20) days from June 19 through July 9, 1992, and for this reason these two months were excluded from the calculation. Mr. Fuhrman also excluded January 1992 because of the abnormal amount of shutdown time during that month. He then computed the average earnings for the remaining nine months and compared this average with the earnings during the shutdown months of June and July 1992.

Dr. Kavanaugh approached the shutdown issue differently. His calculations involve a number of scenarios, set forth on Plaintiffs' Exhibit 149. One difference in approach involves Dr. Kavanaugh's inclusion of January 1992 in his calculations as opposed to Mr. Fuhrman's exclusion of that month due to the atypical amount of down time. The court

agrees with Mr. Fuhrman's approach. In attempting to calculate the company's normal earnings, it makes more sense to exclude abnormal months.

Another significant difference between these two experts includes Dr. Kavanaugh's use of July 1992 in his calculation whereas Mr. Fuhrman excluded that month because the facility was voluntarily shut down for approximately nine days due to an inability to comply with the mercury limit. Dr. Kavanaugh testified that he used July 1992 because, despite the shutdown, revenues that month were actually above average. His analysis misses the point. Even if the July 1992 revenues were above average, it cannot be seriously disputed that the revenues would have been much higher had the company been operating those nine days. In other words, regardless of what the revenues actually were in July 1992, it is clear that they would have been higher if the company had been able to generate revenues for the nine days that it was not operating.

Dr. Kavanaugh agreed that Laidlaw lost money during the 20 days of shutdown between June 19 and July 9, 1992, but he contended that overall the revenues for 1992 were comparable or better than those in 1991. For the same reason as stated *supra,* this also misses the point. Regardless of what the revenues were in 1992, and regardless of how those 1992 revenues compared to other years, the fact is that the revenues would have been "20 days higher" had Laidlaw not voluntarily shut down the Roebuck facility for 20 days in order to avoid exceeding the mercury parameter of its NPDES permit.

■ The third significant difference in approach between the two experts involves Mr. Fuhrman's use of a 12–month period and Dr. Kavanaugh's use of a 34–month period to compute the average monthly earnings of the facility. Mr. Fuhrman testified that he felt that the shorter time frame was more appro-

priate because that more accurately reflected market conditions in effect at the time of the June/July 1992 shutdown. By way of example, he testified that if a person wanted to determine how much money he had lost due to being ill and out of work for a month, that person should look at his earnings during the year of the illness and not earnings two or three years earlier. Mr. Fuhrman's approach makes sense and the court adopts it.

■ Although the court will adopt the basic methodology employed by Dr. Fuhrman in calculating the credit to be allowed for shutdowns, the court agrees with the plaintiffs that not all twenty days of downtime (in June and July 1992) should be credited. The evidence showed that Laidlaw recorded downtime for routine maintenance virtually every month from July 1991 to February 1993, except June and July 1992. Moreover, Laidlaw's plant manager testified that routine maintenance was in fact done during June and July 1992. Accordingly, the court determines that twenty-five percent of the 1994 downtime would have been necessary for routine maintenance. The court will, therefore, reduce Fuhrman's downtime credit by twenty-five percent of $831,136 or $207,784. For this reason, Fuhrman's tabulation of the economic benefit of non-compliance with the 1987 permit must be increased by $207,784, to $1,092,581.

Finally, both parties have calculated a credit of $158,607 representing the present value of the June 1992 payment of a $100,000 fine to DHEC. The court agrees and will apply this credit.

A summary of the court's findings regarding the economic benefit of non-compliance with the 1987 permit are set out on the table attached to this order as Appendix B.

### (c) History of Violations

■ All of the permit violations [17] attributable to Laidlaw are set out in the table at

---

17. Plaintiffs argue that the court must consider all of Laidlaw's permit violations, not just the violations for which Laidlaw is liable. As noted previously, this court removed a number of non-mercury violations from this case under *Gwaltney v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Section

309(d)(3) requires the court to consider "any history of such violations" (emphasis added). The court concludes that the use of the word "violations" in subpart (3), as well as subparts (1) and (2), refer to the violations that form the basis of the penalty being contemplated and not

Appendix A. The reporting and monitoring violations are set out on Plaintiffs' Revised Exhibits 77–79, and 97 and 95 Tr. 181–82, 187. Because Laidlaw purchased the Roebuck facility from ABCO in January 1986, the court need not look at violations that occurred prior to 1986.

### (d) Good Faith Compliance Efforts [18]

 This court is required by Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), to consider a defendant's good faith effort at compliance in assessing an appropriate penalty for Clean Water Act violations. While a lack of good faith effort would constitute an aggravating factor, a genuine effort to comply, particularly with a highly restrictive NPDES permit limit, will mitigate any penalty that the court might assess. *See U.S. v. Ciampitti,* 669 F.Supp. 684, 700 (D.N.J.1987) (lack of good faith effort to comply with the law is aggravating penalty factor); *see also U.S. v. City of Beaumont,* 786 F.Supp. 634, 638–39 (E.D.Tex.1992) (penalty assessed less than maximum but greater than economic benefit where evidence showed that defendant made no effort to comply with NPDES permit).

Laidlaw presented extensive evidence at the 1993 hearing to demonstrate its efforts to achieve compliance with all parameters in its NPDES permit. These efforts included: (1) contracting with two separate environmental consulting firms to conduct bench and pilot testing of all known technologies for reducing the concentration of mercury and other metals in the waste stream; (2) full scale employment of carbon adsorption technology, followed by sulfide precipitation technology, followed by sulfide precipitation technology combined with carbon adsorption, microfiltration and ion resin exchange technology; (3) the replacement of Laidlaw's cooling system and pH controls; and (4) a drastic reduction of the mercury feed into the incinerator to a small fraction of Laidlaw's RCRA/

HSWA permitted feed rate. (Defendant's Exhibit 226).

Following receiving permission from DHEC to construct a treatment system in July 1990, the solution to the non-mercury metals problem was found in March of 1991, with the installation of the Lancy sulfide precipitation system. As this court has previously held, the solution to the mercury problem was not discovered until mid to late 1992, when Laidlaw began utilizing both the Lancy system and carbon adsorption technology together while continuing to severely restrict the mercury feed to the incinerator. 890 F.Supp. at 483.

Laidlaw acted in good faith in relying on qualified environmental consultants to recommend the appropriate technology to solve its wastewater treatment problems. Laidlaw's good faith desire to achieve NPDES compliance is further evidenced by the fact that, after spending more than $1 million on consultants and new wastewater treatment equipment that did not result in compliance, Laidlaw ultimately found the solution through the efforts of its own personnel experimenting with different technologies combined with restricting mercury feed to the incinerator.

Throughout this process, Laidlaw kept DHEC apprised of all efforts to achieve compliance. DHEC was kept apprised of Laidlaw's continuing problems with excursions, and the agency was involved both in reviewing and approving each of the studies, recommendations, and wastewater treatment modifications Laidlaw made to achieve compliance with its permit.

Plaintiffs question Laidlaw's good faith efforts primarily on one ground, that being the allegation that Laidlaw could have resolved its mercury excursions through controlling mercury feed to the incinerator. In support of this assertion, plaintiffs presented a report and chart by Dr. Bruce Bell which indicate that a 79% strength correlation existed be-

---

past violations, barred under *Gwaltney,* that are not before the court.

**18.** As the court observed in its April 7, 1995 opinion, Laidlaw's good faith, or the lack thereof, was not a factor in determining whether the

DHEC judicial enforcement proceeding was diligently prosecuted. 890 F.Supp. at 496, n. 22. The penalty phase of this action is, therefore, the first time the court has been required to address the good faith issue.

tween mercury influent and effluent for a period of time extending from March 1991 to December 1992. This report was supplemented by Dr. Bell's testimony that if Laidlaw kept its average mercury feed at 0.01 pounds per day or less, the company could comply with its mercury limit of 1.3 ppb.

This court does not believe that the mercury exceedances Laidlaw experienced were solely a function of the level of mercury fed into the system. While it is obvious that mercury exceedances could be controlled by simply adding no mercury into the system, this is impractical because much of the hazardous waste produced by industry which requires offsite treatment or disposal contains mercury. This is why there is a mercury parameter contained in Laidlaw's permit and it is why Laidlaw installed wastewater treatment equipment to control mercury.

The court also does not accept the argument that Laidlaw could always have achieved mercury compliance by keeping the mercury feed rate of 0.01 pounds per day. As the court has already found, the solution to Laidlaw's mercury problem was not achieved until Laidlaw, on its own initiative in mid to late 1992, experimented with various technology combinations in addition to reducing the mercury feed. In fact, as Plaintiffs' Exhibits 131 and 150 show, prior to August 1992, Laidlaw restricted the mercury feed to 0.01 pounds per day or less during 20 different months, and the average mercury concentration in the effluent actually exceeded 1.3 ppb 40% of the time. Additionally, there are several examples where the mercury influent far exceeded 0.01 pounds per day but mercury concentration in the effluent was less than 1.3 ppb. Thus, Dr. Bell's contention regarding NPDES compliance at a feed rate of 0.01 lbs. is not accurate.

Concerning the chart showing a correlation between mercury influent and effluent, Dr. Bell used a twenty-two (22) month period between March 1991 and December 1992, rather than the 5.5 years of data available to

him. This was purportedly because the wastewater treatment plant was "relatively stable" during the period analyzed by Dr. Bell. When it was pointed out at trial that the system was also stable during the period extending at least from December 1988 through March 1991, Dr. Bell could not explain why he did not chart those dates other than to say that his memory must have been faulty as to when things were changing.

In fact, when the entire 5.5 year period of time is analyzed, both including periods of equipment stability and change, the alleged strong linear correlation espoused by plaintiffs completely breaks down. More specifically, the linear relationship between mercury influent and effluent decreases to 10% when all of the data is used, and there is no period of time other than the one chosen by Dr. Bell where there is even a 50% relationship between influent and effluent.[19]

From this analysis, it is clear that Laidlaw could not have achieved compliance with a 1.3 ppb limit simply by restricting mercury feed, and in fact still cannot do so. Indeed, the testimony of Laidlaw Environmental Manager David DeSha shows that the strict 1.3 ppb limit has been exceeded twice, in November 1994 and January 1995, when there was no mercury fed into the incinerator at all. The key to controlling mercury effluent is a combination of wastewater treatment efficiency and influent feed. This combination was not achieved until 1992, and fluctuations in mercury feed since that time, usually in the range of ⅛ of an ounce, have not resulted in any mercury excursions.

Laidlaw has thus demonstrated a degree of good faith and, in fact, compliance has now been achieved. This factor warrants a reduction in the penalty.

(e) The Economic Impact of the Penalty Upon the Defendant

In order for this factor to apply, the defendant must establish that a penalty should be reduced because of its economic impact.

**19.** The linear relationship between mercury influent and effluent was 44% from May 1987 to December 1987; 1% from January 1988 to February 1991; 37% from December 1988 through March 1991, when Dr. Bell concedes the system was stable; and only 29% during the March 1991 to December 1992 time period analyzed by Dr. Bell when the two outliers are included in the analysis.

*PIRG v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158 (D.N.J.1989).

Plaintiffs' economic expert testified, without contradiction, that Laidlaw could pay a fine of $10 million without any adverse economic impact. For this reason, a fine in the amount determined by this court (see page 610 *infra*) will not force Laidlaw to suffer economic bankruptcy.

(f) Other Matters As Justice May Require

Several other factors serve to ameliorate the penalty imposed in this case.

### 1. Laidlaw's Failure to Avail Itself of the Reopener Clause

As this court has already found, Laidlaw was given the option of reopening the 1987 Permit to request a higher limit for mercury once the feasibility studies were completed. 890 F.Supp. at 475–76. It did not, however, do so.

The ETE feasibility study (Defendant's Exhibit 13) noted that the removal of mercury from wastewater to a limit of 1.3 ppb was "an extremely difficult and complex problem." It further noted that "there is no inexpensive method to effectively remove mercury to the proposed limit and the technology is still being developed." At that point in time, faced with such a bleak outlook, Laidlaw could have justifiably returned to DHEC and taken the "easy way out" by requesting a higher limit as authorized by the reopener clause. Instead, Laidlaw followed ETE's recommendation and conducted further studies on the two technologies (carbon filtration and ion exchange) recommended by ETE.

Following this additional evaluation, ETE advised Laidlaw in December 1987, that a second carbon filter in series with the existing carbon filter "*should be* able to meet the 1.3 ppb required by the NPDES permit." Defendant Exhibit 30, page 5 (emphasis supplied). Clearly, this rather tentative conclusion fell far short of an unqualified assertion that the two carbon filters would meet the new limit, and at this point in time Laidlaw would again have been justified in returning to DHEC to seek a higher limit under the reopener clause. Instead, Laidlaw elected the more difficult and costly path: install the

technology in an attempt to meet the 1.3 ppb limit. In sum, all parties involved knew that it would be a daunting task to go from 20 ppb to 1.3 ppb but Laidlaw elected to try.

### 2. Recent Compliance History

Related to good faith compliance efforts is the legal principle that a defendant's post-complaint compliance is relevant to the assessment of an appropriate civil penalty. *See FOE v. Facet, Inc.,* 618 F.Supp. 532, 535 n. 1 (W.D.N.Y.1984). In this case, there has been only one alleged monitoring violation since June 1992, and zero reporting violations since that time. Although Laidlaw experienced eleven mercury excursions between June 12 and October, 1992, there was only one excursion annually in 1993, 1994 and 1995. As indicated above, these latter two mercury excursions occurred even though no mercury was being fed into the incinerator, and these occurrences would not have been excursions but for Plaintiffs' appeal of the new NPDES permit establishing a . daily maximum mercury limit of 10 ppb. This compliance history demonstrates that Laidlaw's efforts have remedied its compliance problems and warrants a reduction in the penalty.

### 3. The Ever–Changing Mercury Limit

The mercury limit for ABCO Industries, which owned the Roebuck plant until it was sold to Laidlaw in 1986, was 20 ppb. The new permit, granted Laidlaw when it purchased the plant, reduced the mercury limit to 10 ppb for 1987 and 1.3 ppb from 1988 forward. As of June 1, 1996, it is (and will be, unless reversed on appeal) 10 ppb once again. It *could be* 200 ppb but for Laidlaw's demonstrated ability to achieve a much lower limit.

Thus Laidlaw must, for the forseeable future, comply with a mercury limit that is determined in part by the fact that it has purchased the technology to achieve an unusually restrictive limit. The limit ordinarily would have been much higher.

In *dicta,* the Supreme Court has indicated that a NPDES permittee might be entitled to some consideration for the expenditure of funds in order to achieve a limit lower than

what is required. In *Gwaltney v. Chesapeake Bay Foundation,* 484 U.S. at 60–61, 108 S.Ct. at 383 (1987), the Court addressed the question of whether citizen suits could be brought for wholly-past violations of the Clean Water Act. In answering this question in the negative, the Court reasoned:

> Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.

Thus, the Supreme Court, through *dicta,* has indicated that a reduced penalty, or even no penalty, may be appropriate when an administrative sanction is assessed against a violator who has purchased equipment that will allow it to stay far below what would otherwise be required. The court knows of no reason why such a principle should not apply to a judicial proceeding such as the present one.[20]

### (d) Penalty Amount

■■■ Although the court finds that Laidlaw's economic benefit equals $1,092,581, the factors set forth in this opinion convince the court that Laidlaw should not be penalized in an amount equal to the economic benefit of non-compliance. In *United States v. Roll Coater, Inc.,* the court indicated in dicta that, although economic benefit is one of the factors to be considered by a court, "other factors may decrease the imposed penalty below the calculated economic benefit." 21 E.L.R. 21073, 21075, 1991 WL 165771 (S.D.Ind.1991) (emphasis supplied). In *Roll Coater,* the court indicated that such factors could include "evidence of the difficulty of compliance," the fact that there was "no

proven damage to the environment, and hence, that the violations were not serious within the meaning of the Act," and the fact that the company worked hand-in-hand with the state agency in an attempt to achieve compliance. *Id.* at 21076–21077. These factors apply in the case at bar. Likewise, in *United States v. Avatar Holdings, Inc.,* the court noted that the "courts' determination of the penalty under the Clean Water Act has been characterized as 'highly discretionary.'" 1996 W.L. 479533, *5 (M.D.Fla.1996) (citations omitted). Similarly, the court held that a "substantial reduction in the maximum statutory penalty is warranted where the violations caused minimal [or no] environmental damage." *Id.* at *6. Moreover, the court cannot ignore the fact that the mercury limit has changed significantly while this litigation was pending as further evidence that compliance with the prior, stricter standard was not absolutely necessary to avoid environmental harm.

The court establishes a civil penalty according to the following table:

#### Mercury Exceedances

| | |
|---|---|
| 242 discharges 1% to 100% over permit level @ $200 | = $ 48,400 |
| 193 discharges 101% to 400% over permit level @ $700 | = $135,100 |
| 35 discharges 401% to 1,000% over permit level @ $1,000 | = $ 35,000 |
| 19 discharges more than 1,000% over permit level @ $5,000 | = $ 95,000 |

#### Monitoring and Reporting Violations

| | |
|---|---|
| 420 monitoring violations @ $100 | = $ 42,000 |
| 503 reporting violations @ $100 | = $ 50,300 |
| | $405,800 |

The above penalty is, on its face, less than half of the economic benefit. It might, therefore, be argued that Laidlaw has ultimately benefitted from its non-compliance and would not, therefore, be deterred from future violations. When the total deterrent effect of this action is considered, however, this court does not believe this to be the case. That is, in setting the above penalty, this court has considered that Laidlaw will be required to re-

---

**20.** The court recognizes that the analogy to *Gwaltney* is not perfect. Laidlaw's purchase of technology was in response to the then-imposed 1.3 ppb limit and not out of a desire to go the extra mile.

imburse plaintiffs for a significant amount of legal fees and has, itself, incurred significant legal expenses. Taken together, this court believes the above penalty, potential fee awards, and Laidlaw's own direct and indirect litigation expenses provide adequate deterrence under the circumstances of this case.

### 2. *Equitable Relief*

 In addition to seeking a monetary penalty, plaintiffs request both a declaratory judgment and injunctive relief. Plaintiffs also ask that this court direct Laidlaw to submit DMRs directly to plaintiffs so that they, along with DHEC and EPA, can monitor Laidlaw's future compliance, and plaintiffs further request all back-up compliance documentation. Laidlaw is not required to submit back-up documentation to DHEC and EPA.

As noted previously, the new limits for mercury (10 ppb daily maximum/1.25 ppb monthly average) are now in effect unless and until the new permit is reversed by the state courts of South Carolina. For this reason, any injunction issuing from this court would necessarily apply these new, more lenient, standards for mercury.

In order to show that they are entitled to injunctive relief, plaintiffs must demonstrate, at a minimum, that they will suffer irreparable injury if such relief is not granted. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 544–47, 107 S.Ct. 1396, 1403–05, 94 L.Ed.2d 542 (1987); *NRDC v. Texaco Refining and Marketing, Inc.*, 906 F.2d 934 (3rd Cir.1990). Injunctive relief is not appropriate where the defendant is in compliance or in substantial compliance with the Clean Water Act, *PIRG v. Yates Industries*, 757 F.Supp. 438 (D.N.J.1991); *citing Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct.

1798, 72 L.Ed.2d 91 (1982), and a defendant in substantial compliance with its NPDES permit is not required to show that there is no chance of a future permit violation in order to defeat a request for injunctive relief. *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128 (11th Cir. 1990).

In this case, Laidlaw has been in substantial compliance with all parameters in its NPDES permit since at least August 1992. This includes mercury, all other metals, temperature, pH and all monitoring and reporting obligations. In fact, Laidlaw has been in compliance with the vast majority of its permit requirements for a much longer period of time, extending back to March 1991 when the Lancy system was installed. The only mercury violations in 1994 and 1995 were at the levels of 2.7 ppb and 1.6 ppb, respectively, and these would not have been permit exceedances at all had not plaintiffs by their appeal stayed the effective date of Laidlaw's new NPDES permit containing a daily maximum limit for mercury of 10 ppb. As Laidlaw witness David DeSha testified, without contradiction, these latter two exceedances occurred when there was no mercury being fed to the incinerator, and this demonstrates that it is not possible for Laidlaw to guarantee that there is no chance of a future exceedance of the 10/1.25 limits now in effect.

Laidlaw's compliance history also must be considered together with the evidence regarding harm to the environment. The lack of demonstrated harm and the fact that Laidlaw is now and has for an extended period of time been in compliance with its permit compels the conclusion that no injunction or other form of equitable relief is appropriate. Accordingly, plaintiffs' request for equitable relief is denied.

## CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, the court holds that: this court has jurisdiction over defendant's violations of its permit and the Clean Water Act; defendant is liable for the violations of the mercury discharge limitation and the violations of the monitoring and reporting requirements of its NPDES permit identified herein; and a civil penalty of $405,800 shall be assessed against defendant for its violations of its permit and the Act. The plaintiffs' request for a permanent injunction is denied.

IT IS SO ORDERED.

# APPENDIX A

FRIENDS OF THE EARTH v. LAIDLAW ENVIRONMENTAL SERVICES (TOC),
D.S.C. Civ. No. 3–92–1697–17
CHRONOLOGICAL LIST OF DEFENDANT'S OUTFALL 001 DISCHARGE VIOLATIONS

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | | | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 21 | 1/87 | 1 | 24 | 87 | Hg | M | 0.0100 mg/l | 0.0145 mg/l | 1 | 45 | 1 |
| 2 | 22 | 1/87 | 1 | 25 | 87 | Hg | M | 0.0100 mg/l | 0.0247 mg/l | 2 | 147 | 1 |
| 3 | 23 | 1/87 | 1 | 26 | 87 | Hg | M | 0.0100 mg/l | 0.0180 mg/l | 3 | 80 | 1 |
| 4 | 34 | 3/87 | 3 | 17 | 87 | Hg | M | 0.0100 mg/l | 0.0166 mg/l | 4 | 66 | 1 |
| 5 | 37 | 4/87 | 4 | 7 | 87 | Hg | M | 0.0100 mg/l | 0.0197 mg/l | 6 | 97 | 1 |
| 6 | 38 | 4/87 | 4 | 16 | 87 | Hg | M | 0.0100 mg/l | 0.0240 mg/l | 7 | 140 | 1 |
| 7 | 41 | 5/87 | 5 | 3 | 87 | Hg | M | 0.0100 mg/l | 0.0154 mg/l | 8 | 54 | 1 |
| 8 | 42 | 5/87 | 5 | 4 | 87 | Hg | M | 0.0100 mg/l | 0.0101 mg/l | 9 | 1 | 1 |
| 9 | 43 | 5/87 | 5 | 5 | 87 | Hg | M | 0.0100 mg/l | 0.0142 mg/l | 10 | 42 | 1 |
| 10 | 44 | 5/87 | 5 | 10 | 87 | Hg | M | 0.0100 mg/l | 0.0146 mg/l | 11 | 46 | 1 |
| 11 | 53 | 8/87 | 8 | 7 | 87 | Hg | M | 0.0100 mg/l | 0.0130 mg/l | 12 | 30 | 1 |
| 12 | 64 | 12/87 | 12 | 2 | 87 | Hg | M | 0.0100 mg/l | 0.0138 mg/l | 13 | 38 | 1 |
| 13 | 65 | 12/87 | 12 | 29 | 87 | Hg | M | 0.0100 mg/l | 0.0110 mg/l | 14 | 10 | 1 |
| 14 | 69 | 1/88 | 1 | 30 | 88 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 15 | 115 | 1 |
| 15 | 75 | 1/88 | 1 | 31 | 88 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 16 | 15 | 1 |
| 16 | 77 | 2/88 | 2 | 6 | 88 | Hg | M | 0.0013 mg/l | 0.0143 mg/l | 17 | 1000 | 1 |
| 17 | 78 | 2/88 | 2 | 12 | 88 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 18 | 31 | 1 |
| 18 | 79 | 2/88 | 2 | 13 | 88 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 19 | 23 | 1 |
| 19 | 80 | 2/88 | 2 | 14 | 88 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 20 | 92 | 1 |
| 20 | 81 | 2/88 | 2 | 15 | 88 | Hg | M | 0.0013 mg/l | 0.0058 mg/l | 21 | 346 | 1 |
| 21 | 82 | 2/88 | 2 | 19 | 88 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 22 | 131 | 1 |
| 22 | 83 | 2/88 | 2 | 20 | 88 | Hg | M | 0.0013 mg/l | 0.0081 mg/l | 23 | 523 | 1 |
| 23 | 84 | 2/88 | 2 | 21 | 88 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 24 | 138 | 1 |
| 24 | 85 | 2/88 | 2 | 25 | 88 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 25 | 215 | 1 |
| 25 | 86 | 2/88 | 2 | 27 | 88 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 26 | 54 | 1 |
| 26 | 87 | 2/88 | 2 | 28 | 88 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 27 | 31 | 1 |
| 27 | 102 | 3/88 | 3 | 3 | 88 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 28 | 69 | 1 |
| 28 | 103 | 3/88 | 3 | 4 | 88 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 29 | 62 | 1 |
| 29 | 104 | 3/88 | 3 | 5 | 88 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 30 | 46 | 1 |
| 30 | 105 | 3/88 | 3 | 6 | 88 | Hg | M | 0.0013 mg/l | 0.0060 mg/l | 31 | 362 | 1 |
| 31 | 106 | 3/88 | 3 | 14 | 88 | Hg | M | 0.0013 mg/l | 0.0047 mg/l | 32 | 262 | 1 |
| 32 | 107 | 3/88 | 3 | 20 | 88 | Hg | M | 0.0013 mg/l | 0.0071 mg/l | 33 | 446 | 1 |
| 33 | 127 | 4/88 | 4 | 2 | 88 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 34 | 38 | 1 |
| 34 | 128 | 4/88 | 4 | 8 | 88 | Hg | M | 0.0013 mg/l | 0.0057 mg/l | 35 | 338 | 1 |
| 35 | 129 | 4/88 | 4 | 9 | 88 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 36 | 192 | 1 |
| 36 | 130 | 4/88 | 4 | 10 | 88 | Hg | M | 0.0013 mg/l | 0.0138 mg/l | 37 | 962 | 1 |
| 37 | 131 | 4/88 | 4 | 11 | 88 | Hg | M | 0.0013 mg/l | 0.0383 mg/l | 38 | 2846 | 1 |
| 38 | 132 | 4/88 | 4 | 12 | 88 | Hg | M | 0.0013 mg/l | 0.0356 mg/l | 39 | 2638 | 1 |
| 39 | 133 | 4/88 | 4 | 13 | 88 | Hg | M | 0.0013 mg/l | 0.0084 mg/l | 40 | 546 | 1 |
| 40 | 144 | 5/88 | 5 | 13 | 88 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 41 | 15 | 1 |
| 41 | 145 | 5/88 | 5 | 17 | 88 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 42 | 38 | 1 |
| 42 | 151 | 6/88 | 6 | 3 | 88 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 43 | 23 | 1 |
| 43 | 152 | 6/88 | 6 | 4 | 88 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 44 | 8 | 1 |
| 44 | 153 | 6/88 | 6 | 26 | 88 | Hg | M | 0.0013 mg/l | 0.0110 mg/l | 45 | 746 | 1 |
| 45 | 154 | 6/88 | 6 | 27 | 88 | Hg | M | 0.0013 mg/l | 0.0156 mg/l | 46 | 1100 | 1 |
| 46 | 155 | 6/88 | 6 | 28 | 88 | Hg | M | 0.0013 mg/l | 0.0068 mg/l | 47 | 423 | 1 |
| 47 | 176 | 7/88 | 7 | 16 | 88 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 48 | 15 | 1 |
| 48 | 209 | 7/88 | 7 | 31 | 88 | Hg | M | 0.0013 mg/l | 0.0050 mg/l | 49 | 285 | 1 |
| 49 | 210 | 8/88 | 8 | 10 | 88 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 50 | 69 | 1 |
| 50 | 211 | 8/88 | 8 | 15 | 88 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 51 | 208 | 1 |
| 51 | 212 | 8/88 | 8 | 16 | 88 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 52 | 215 | 1 |
| 52 | 213 | 8/88 | 8 | 17 | 88 | Hg | M | 0.0013 mg/l | 0.0053 mg/l | 53 | 308 | 1 |
| 53 | 214 | 8/88 | 8 | 18 | 88 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 54 | 208 | 1 |
| 54 | 215 | 8/88 | 8 | 19 | 88 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 55 | 46 | 1 |
| 55 | 216 | 8/88 | 8 | 26 | 88 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 56 | 38 | 1 |
| 56 | 252 | 10/88 | 10 | 6 | 88 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 57 | 46 | 1 |

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | | | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57 | 253 | 10/88 | 10 | 7 | 88 | Hg | M | 0.0013 mg/l | 0.0150 mg/l | 58 | 1054 | 1 |
| 58 | 254 | 10/88 | 10 | 8 | 88 | Hg | M | 0.0013 mg/l | 0.0150 mg/l | 59 | 1054 | 1 |
| 59 | 255 | 10/88 | 10 | 9 | 88 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 60 | 215 | 1 |
| 60 | 256 | 10/88 | 10 | 13 | 88 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 61 | 8 | 1 |
| 61 | 257 | 10/88 | 10 | 14 | 88 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 62 | 46 | 1 |
| 62 | 258 | 10/88 | 10 | 15 | 88 | Hg | M | 0.0013 mg/l | 0.0060 mg/l | 63 | 362 | 1 |
| 63 | 259 | 10/88 | 10 | 16 | 88 | Hg | M | 0.0013 mg/l | 0.0073 mg/l | 64 | 462 | 1 |
| 64 | 260 | 10/88 | 10 | 17 | 88 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 65 | 92 | 1 |
| 65 | 264 | 11/88 | 11 | 22 | 88 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 66 | 23 | 1 |
| 66 | 272 | 12/88 | 12 | 1 | 88 | Hg | M | 0.0013 mg/l | 0.0050 mg/l | 67 | 285 | 1 |
| 67 | 273 | 12/88 | 12 | 2 | 88 | Hg | M | 0.0013 mg/l | 0.0075 mg/l | 68 | 477 | 1 |
| 68 | 274 | 12/88 | 12 | 3 | 88 | Hg | M | 0.0013 mg/l | 0.0070 mg/l | 69 | 438 | 1 |
| 69 | 275 | 12/88 | 12 | 4 | 88 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 70 | 208 | 1 |
| 70 | 276 | 12/88 | 12 | 8 | 88 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 71 | 123 | 1 |
| 71 | 277 | 12/88 | 12 | 9 | 88 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 72 | 31 | 1 |
| 72 | 278 | 12/88 | 12 | 10 | 88 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 73 | 100 | 1 |
| 73 | 279 | 12/88 | 12 | 11 | 88 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 74 | 108 | 1 |
| 74 | 280 | 12/88 | 12 | 12 | 88 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 75 | 85 | 1 |
| 75 | 281 | 12/88 | 12 | 13 | 88 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 76 | 38 | 1 |
| 76 | 282 | 12/88 | 12 | 19 | 88 | Hg | M | 0.0013 mg/l | 0.0060 mg/l | 77 | 362 | 1 |
| 77 | 283 | 12/88 | 12 | 20 | 88 | Hg | M | 0.0013 mg/l | 0.0165 mg/l | 78 | 1169 | 1 |
| 78 | 284 | 12/88 | 12 | 21 | 88 | Hg | M | 0.0013 mg/l | 0.0072 mg/l | 79 | 454 | 1 |
| 79 | 285 | 12/88 | 12 | 22 | 88 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 80 | 92 | 1 |
| 80 | 287 | 12/88 | 12 | 28 | 88 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 82 | 123 | 1 |
| 81 | 288 | 12/88 | 12 | 29 | 88 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 83 | 15 | 1 |
| 82 | 290 | 1/89 | 1 | 6 | 89 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 84 | 100 | 1 |
| 83 | 298 | 2/89 | 2 | 5 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 90 | 208 | 1 |
| 84 | 299 | 2/89 | 2 | 6 | 89 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 91 | 8 | 1 |
| 85 | 300 | 2/89 | 2 | 7 | 89 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 92 | 15 | 1 |
| 86 | 301 | 2/89 | 2 | 9 | 89 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 93 | 85 | 1 |
| 87 | 302 | 2/89 | 2 | 10 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 94 | 208 | 1 |
| 88 | 303 | 2/89 | 2 | 11 | 89 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 95 | 192 | 1 |
| 89 | 304 | 2/89 | 2 | 12 | 89 | Hg | M | 0.0013 mg/l | 0.0048 mg/l | 96 | 269 | 1 |
| 90 | 305 | 2/89 | 2 | 13 | 89 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 97 | 69 | 1 |
| 91 | 317 | 3/89 | 3 | 2 | 89 | Hg | M | 0.0013 mg/l | 0.0036 mg/l | 104 | 177 | 1 |
| 92 | 318 | 3/89 | 3 | 3 | 89 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 105 | 131 | 1 |
| 93 | 319 | 3/89 | 3 | 4 | 89 | Hg | M | 0.0013 mg/l | 0.0070 mg/l | 106 | 438 | 1 |
| 94 | 321 | 3/89 | 3 | 6 | 89 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 108 | 54 | 1 |
| 95 | 328 | 3/89 | 3 | 26 | 89 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 115 | 69 | 1 |
| 96 | 329 | 3/89 | 3 | 27 | 89 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 116 | 54 | 1 |
| 97 | 332 | 4/89 | 4 | 2 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 117 | 208 | 1 |
| 98 | 333 | 4/89 | 4 | 3 | 89 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 118 | 54 | 1 |
| 99 | 334 | 4/89 | 4 | 4 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 119 | 208 | 1 |
| 100 | 336 | 4/89 | 4 | 19 | 89 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 121 | 62 | 1 |
| 101 | 349 | 5/89 | 5 | 20 | 89 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 127 | 192 | 1 |
| 102 | 352 | 5/89 | 5 | 27 | 89 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 130 | 15 | 1 |
| 103 | 353 | 5/89 | 5 | 29 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 131 | 208 | 1 |
| 104 | 354 | 5/89 | 5 | 30 | 89 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 132 | 118 | 1 |
| 105 | 364 | 6/89 | 6 | 16 | 89 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 133 | 54 | 1 |
| 106 | 365 | 6/89 | 6 | 17 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 134 | 208 | 1 |
| 107 | 366 | 6/89 | 6 | 18 | 89 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 135 | 54 | 1 |
| 108 | 367 | 6/89 | 6 | 19 | 89 | Hg | M | 0.0013 mg/l | 0.0032 mg/l | 136 | 146 | 1 |
| 109 | 368 | 6/89 | 6 | 20 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 137 | 208 | 1 |
| 110 | 369 | 6/89 | 6 | 21 | 89 | Hg | M | 0.0013 mg/l | 0.0049 mg/l | 138 | 277 | 1 |
| 111 | 370 | 6/89 | 6 | 22 | 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 139 | 208 | 1 |
| 112 | 371 | 6/89 | 6 | 23 | 89 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 140 | 154 | 1 |
| 113 | 372 | 6/89 | 6 | 24 | 89 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 141 | 62 | 1 |
| 114 | 373 | 6/89 | 6 | 25 | 89 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 142 | 62 | 1 |

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|
| 115 | 374 | 6/89 | 6 27 89 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 143 | 8 | 1 |
| 116 | 383 | 7/89 | 7 15 89 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 148 | 38 | 1 |
| 117 | 384 | 7/89 | 7 16 89 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 149 | 38 | 1 |
| 118 | 385 | 7/89 | 7 22 89 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 150 | 31 | 1 |
| 119 | 386 | 7/89 | 7 24 89 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 151 | 54 | 1 |
| 120 | 388 | 7/89 | 7 27 89 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 153 | 38 | 1 |
| 121 | 399 | 8/89 | 8 3 89 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 154 | 77 | 1 |
| 122 | 400 | 8/89 | 8 16 89 | Hg | M | 0.0013 mg/l | 0.0050 mg/l | 155 | 285 | 1 |
| 123 | 401 | 8/89 | 8 17 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 156 | 208 | 1 |
| 124 | 411 | 9/89 | 9 9 89 | Hg | M | 0.0013 mg/l | 0.0200 mg/l | 157 | 1438 | 1 |
| 125 | 412 | 9/89 | 9 12 89 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 158 | 8 | 1 |
| 126 | 413 | 9/89 | 9 26 89 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 159 | 85 | 1 |
| 127 | 420 | 10/89 | 10 21 89 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 160 | 77 | 1 |
| 128 | 421 | 10/89 | 10 30 89 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 161 | 15 | 1 |
| 129 | 429 | 10/89 | 10 31 89 | Hg | M | 0.0013 mg/l | 0.0035 mg/l | 162 | 169 | 1 |
| 130 | 433 | 11/89 | 11 7 89 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 166 | 69 | 1 |
| 131 | 434 | 11/89 | 11 8 89 | Hg | M | 0.0013 mg/l | 0.0055 mg/l | 167 | 323 | 1 |
| 132 | 435 | 11/89 | 11 9 89 | Hg | M | 0.0013 mg/l | 0.0050 mg/l | 168 | 285 | 1 |
| 133 | 437 | 11/89 | 11 15 89 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 170 | 77 | 1 |
| 134 | 439 | 11/89 | 11 17 89 | Hg | M | 0.0013 mg/l | 0.0058 mg/l | 172 | 346 | 1 |
| 135 | 440 | 11/89 | 11 18 89 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 173 | 108 | 1 |
| 136 | 441 | 11/89 | 11 19 89 | Hg | M | 0.0013 mg/l | 0.0058 mg/l | 174 | 346 | 1 |
| 137 | 442 | 11/89 | 11 20 89 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 175 | 162 | 1 |
| 138 | 443 | 11/89 | 11 21 89 | Hg | M | 0.0013 mg/l | 0.0054 mg/l | 176 | 315 | 1 |
| 139 | 444 | 11/89 | 11 29 89 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 177 | 208 | 1 |
| 140 | 459 | 11/89 | 11 30 89 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 178 | 38 | 1 |
| 141 | 460 | 12/89 | 12 16 89 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 179 | 15 | 1 |
| 142 | 494 | 1/90 | 1 10 90 | Hg | M | 0.0013 mg/l | 0.0078 mg/l | 180 | 500 | 1 |
| 143 | 495 | 1/90 | 1 17 90 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 181 | 23 | 1 |
| 144 | 496 | 1/90 | 1 18 90 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 182 | 115 | 1 |
| 145 | 497 | 1/90 | 1 19 90 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 185 | 131 | 1 |
| 146 | 498 | 1/90 | 1 21 90 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 186 | 54 | 1 |
| 147 | 499 | 1/90 | 1 22 90 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 187 | 31 | 1 |
| 148 | 500 | 1/90 | 1 24 90 | Hg | M | 0.0013 mg/l | 0.0050 mg/l | 188 | 285 | 1 |
| 149 | 501 | 1/90 | 1 26 90 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 190 | 100 | 1 |
| 150 | 523 | 2/90 | 2 16 90 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 191 | 46 | 1 |
| 151 | 546 | 3/90 | 3 7 90 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 192 | 85 | 1 |
| 152 | 547 | 3/90 | 3 17 90 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 193 | 23 | 1 |
| 153 | 548 | 3/90 | 3 18 90 | Hg | M | 0.0013 mg/l | 0.0315 mg/l | 00194–196 | 2323 | 1 |
| 154 | 549 | 3/90 | 3 22 90 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 197 | 23 | 1 |
| 155 | 550 | 3/90 | 3 26 90 | Hg | M | 0.0013 mg/l | 0.0085 mg/l | 198 | 554 | 1 |
| 156 | 551 | 3/90 | 3 27 90 | Hg | M | 0.0013 mg/l | 0.0060 mg/l | 200 | 362 | 1 |
| 157 | 552 | 3/90 | 3 28 90 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 202 | 123 | 1 |
| 158 | 553 | 3/90 | 3 29 90 | Hg | M | 0.0013 mg/l | 0.0060 mg/l | 203 | 362 | 1 |
| 159 | 591 | 4/90 | 4 4 90 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 204 | 100 | 1 |
| 160 | 592 | 4/90 | 4 5 90 | Hg | M | 0.0013 mg/l | 0.0037 mg/l | 205 | 183 | 1 |
| 161 | 593 | 4/90 | 4 9 90 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 206 | 54 | 1 |
| 162 | 594 | 4/90 | 4 18 90 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 207 | 46 | 1 |
| 163 | 595 | 4/90 | 4 19 90 | Hg | M | 0.0013 mg/l | 0.0050 mg/l | 208 | 285 | 1 |
| 164 | 596 | 4/90 | 4 20 90 | Hg | M | 0.0013 mg/l | 0.0056 mg/l | 209 | 331 | 1 |
| 165 | 617 | 5/90 | 5 1 90 | Hg | M | 0.0013 mg/l | 0.0060 mg/l | 211 | 362 | 1 |
| 166 | 618 | 5/90 | 5 8 90 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 212 | 54 | 1 |
| 167 | 619 | 5/90 | 5 9 90 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 213 | 192 | 1 |
| 168 | 620 | 5/90 | 5 10 90 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 214 | 15 | 1 |
| 169 | 621 | 5/90 | 5 11 90 | Hg | M | 0.0013 mg/l | 0.0051 mg/l | 215 | 292 | 1 |
| 170 | 622 | 5/90 | 5 13 90 | Hg | M | 0.0013 mg/l | 0.0032 mg/l | 216 | 146 | 1 |
| 171 | 623 | 5/90 | 5 14 90 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 217 | 77 | 1 |
| 172 | 629 | 6/90 | 6 13 90 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 218 | 31 | 1 |

616

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | | | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 173 | 630 | 6/90 | 6 | 15 | 90 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 221 | 23 | 1 |
| 174 | 634 | 7/90 | 7 | 22 | 90 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 222 | 131 | 1 |
| 175 | 635 | 7/90 | 7 | 23 | 90 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 223 | 38 | 1 |
| 176 | 636 | 7/90 | 7 | 29 | 90 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 224 | 23 | 1 |
| 177 | 637 | 7/90 | 7 | 30 | 90 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 225 | 38 | 1 |
| 178 | 640 | 8/90 | 8 | 2 | 90 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 226 | 8 | 1 |
| 179 | 641 | 8/90 | 8 | 8 | 90 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 227 | 115 | 1 |
| 180 | 642 | 8/90 | 8 | 9 | 90 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 228 | 54 | 1 |
| 181 | 643 | 8/90 | 8 | 17 | 90 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 229 | 69 | 1 |
| 182 | 644 | 8/90 | 8 | 18 | 90 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 230 | 15 | 1 |
| 183 | 645 | 8/90 | 8 | 19 | 90 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 231 | 62 | 1 |
| 184 | 646 | 8/90 | 8 | 21 | 90 | Hg | M | 0.0013 mg/l | 0.0044 mg/l | 232 | 238 | 1 |
| 185 | 647 | 8/90 | 8 | 22 | 90 | Hg | M | 0.0013 mg/l | 0.0066 mg/l | 233 | 408 | 1 |
| 186 | 648 | 8/90 | 8 | 23 | 90 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 234 | 108 | 1 |
| 187 | 654 | 9/90 | 9 | 22 | 90 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 235 | 154 | 1 |
| 188 | 655 | 9/90 | 9 | 23 | 90 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 236 | 131 | 1 |
| 189 | 656 | 9/90 | 9 | 24 | 90 | Hg | M | 0.0013 mg/l | 0.0100 mg/l | 237 | 669 | 1 |
| 190 | 666 | 10/90 | 10 | 8 | 90 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 238 | 15 | 1 |
| 191 | 667 | 10/90 | 10 | 11 | 90 | Hg | M | 0.0013 mg/l | 0.0055 mg/l | 239 | 323 | 1 |
| 192 | 668 | 10/90 | 10 | 14 | 90 | Hg | M | 0.0013 mg/l | 0.0350 mg/l | 240 | 2592 | 1 |
| 193 | 676 | 11/90 | 11 | 29 | 90 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 241 | 85 | 1 |
| 194 | 677 | 11/90 | 11 | 30 | 90 | Hg | M | 0.0013 mg/l | 0.0075 mg/l | 242 | 477 | 1 |
| 195 | 685 | 12/90 | 12 | 1 | 90 | Hg | M | 0.0013 mg/l | 0.0170 mg/l | 243 | 1208 | 1 |
| 196 | 686 | 12/90 | 12 | 2 | 90 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 245 | 15 | 1 |
| 197 | 687 | 12/90 | 12 | 18 | 90 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 246 | 96 | 1 |
| 198 | 690 | 1/91 | 1 | 1 | 91 | Hg | M | 0.0013 mg/l | 0.0055 mg/l | 247 | 323 | 1 |
| 199 | 691 | 1/91 | 1 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 248 | 77 | 1 |
| 200 | 692 | 1/91 | 1 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0044 mg/l | 249 | 238 | 1 |
| 201 | 693 | 1/91 | 1 | 8 | 91 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 250 | 162 | 1 |
| 202 | 707 | 2/91 | 2 | 2 | 91 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 251 | 92 | 1 |
| 203 | 712 | 3/91 | 3 | 1 | 91 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 00252–253 | 112 | 1 |
| 204 | 713 | 3/91 | 3 | 3 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 00254–255 | 54 | 1 |
| 205 | 714 | 3/91 | 3 | 4 | 91 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 00256–257 | 73 | 1 |
| 206 | 715 | 3/91 | 3 | 5 | 91 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 258 | 123 | 1 |
| 207 | 716 | 3/91 | 3 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 259 | 69 | 1 |
| 208 | 717 | 3/91 | 3 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0035 mg/l | 260 | 169 | 1 |
| 209 | 718 | 3/91 | 3 | 22 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 00261–263 | 35 | 1 |
| 210 | 719 | 3/91 | 3 | 27 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 00264–266 | 35 | 1 |
| 211 | 722 | 4/91 | 4 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 267 | 62 | 1 |
| 212 | 723 | 4/91 | 4 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 268 | 54 | 1 |
| 213 | 724 | 4/91 | 4 | 25 | 91 | Hg | M | 0.0013 mg/l | 0.0035 mg/l | 269 | 169 | 1 |
| 214 | 725 | 4/91 | 4 | 26 | 91 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 270 | 138 | 1 |
| 215 | 726 | 4/91 | 4 | 27 | 91 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 271 | 154 | 1 |
| 216 | 727 | 4/91 | 4 | 28 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 272 | 38 | 1 |
| 217 | 728 | 4/91 | 4 | 29 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 273 | 23 | 1 |
| 218 | 729 | 4/91 | 4 | 30 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 274 | 15 | 1 |
| 219 | 733 | 5/91 | 5 | 1 | 91 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 275 | 77 | 1 |
| 220 | 734 | 5/91 | 5 | 2 | 91 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 276 | 138 | 1 |
| 221 | 735 | 5/91 | 5 | 3 | 91 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 277 | 115 | 1 |
| 222 | 736 | 5/91 | 5 | 4 | 91 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 278 | 62 | 1 |
| 223 | 737 | 5/91 | 5 | 5 | 91 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 279 | 115 | 1 |
| 224 | 738 | 5/91 | 5 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 280 | 154 | 1 |
| 225 | 739 | 5/91 | 5 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 282 | 8 | 1 |
| 226 | 740 | 5/91 | 5 | 8 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 283 | 38 | 1 |
| 227 | 741 | 5/91 | 5 | 9 | 91 | Hg | M | 0.0013 mg/l | 0.0058 mg/l | 284 | 346 | 1 |
| 228 | 742 | 5/91 | 5 | 11 | 91 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 285 | 31 | 1 |
| 229 | 743 | 5/91 | 5 | 12 | 91 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 286 | 69 | 1 |
| 230 | 744 | 5/91 | 5 | 13 | 91 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 287 | 154 | 1 |

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | | | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 231 | 745 | 5/91 | 5 | 14 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 288 | 23 | 1 |
| 232 | 746 | 5/91 | 5 | 19 | 91 | Hg | M | 0.0013 mg/l | 0.0083 mg/l | 290 | 538 | 1 |
| 233 | 747 | 5/91 | 5 | 20 | 91 | Hg | M | 0.0014 mg/l | 0.0014 mg/l | 291 | 8 | 1 |
| 234 | 748 | 5/91 | 5 | 21 | 91 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 292 | 46 | 1 |
| 235 | 749 | 5/91 | 5 | 22 | 91 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 293 | 162 | 1 |
| 236 | 750 | 5/91 | 5 | 23 | 91 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 294 | 108 | 1 |
| 237 | 751 | 5/91 | 5 | 24 | 91 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 295 | 208 | 1 |
| 238 | 752 | 5/91 | 5 | 25 | 91 | Hg | M | 0.0013 mg/l | 0.0037 mg/l | 296 | 185 | 1 |
| 239 | 753 | 5/91 | 5 | 26 | 91 | Hg | M | 0.0013 mg/l | 0.0044 mg/l | 297 | 238 | 1 |
| 240 | 754 | 5/91 | 5 | 27 | 91 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 298 | 208 | 1 |
| 241 | 755 | 5/91 | 5 | 28 | 91 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 299 | 215 | 1 |
| 242 | 756 | 5/91 | 5 | 29 | 91 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 300 | 192 | 1 |
| 243 | 757 | 5/91 | 5 | 30 | 91 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 301 | 31 | 1 |
| 244 | 758 | 5/91 | 5 | 31 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 302 | 54 | 1 |
| 245 | 761 | 6/91 | 6 | 1 | 91 | Hg | M | 0.0013 mg/l | 0.0043 mg/l | 303 | 231 | 1 |
| 246 | 762 | 6/91 | 6 | 2 | 91 | Hg | M | 0.0013 mg/l | 0.0076 mg/l | 304 | 485 | 1 |
| 247 | 763 | 6/91 | 6 | 3 | 91 | Hg | M | 0.0013 mg/l | 0.0063 mg/l | 305 | 385 | 1 |
| 248 | 764 | 6/91 | 6 | 5 | 91 | Hg | M | 0.0013 mg/l | 0.0092 mg/l | 306 | 608 | 1 |
| 249 | 765 | 6/91 | 6 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0051 mg/l | 307 | 292 | 1 |
| 250 | 766 | 6/91 | 6 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 308 | 192 | 1 |
| 251 | 767 | 6/91 | 6 | 8 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 309 | 8 | 1 |
| 252 | 768 | 6/91 | 6 | 9 | 91 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 310 | 31 | 1 |
| 253 | 769 | 6/91 | 6 | 10 | 91 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 312 | 92 | 1 |
| 254 | 770 | 6/91 | 6 | 12 | 91 | Hg | M | 0.0013 mg/l | 0.0036 mg/l | 313 | 177 | 1 |
| 255 | 771 | 6/91 | 6 | 13 | 91 | Hg | M | 0.0013 mg/l | 0.0032 mg/l | 314 | 146 | 1 |
| 256 | 772 | 6/91 | 6 | 15 | 91 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 317 | 31 | 1 |
| 257 | 773 | 6/91 | 6 | 16 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 319 | 15 | 1 |
| 258 | 774 | 6/91 | 6 | 17 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 320 | 23 | 1 |
| 259 | 775 | 6/91 | 6 | 18 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 321 | 54 | 1 |
| 260 | 776 | 6/91 | 6 | 19 | 91 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 322 | 31 | 1 |
| 261 | 777 | 6/91 | 6 | 20 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 323 | 8 | 1 |
| 262 | 778 | 6/91 | 6 | 23 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 324 | 15 | 1 |
| 263 | 779 | 6/91 | 6 | 24 | 91 | Hg | M | 0.0013 mg/l | 0.0046 mg/l | 326 | 254 | 1 |
| 264 | 780 | 6/91 | 6 | 25 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 327 | 38 | 1 |
| 265 | 781 | 6/91 | 6 | 28 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 328 | 8 | 1 |
| 266 | 784 | 7/91 | 7 | 4 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 329 | 23 | 1 |
| 267 | 785 | 7/91 | 7 | 5 | 91 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 330 | 108 | 1 |
| 268 | 786 | 7/91 | 7 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0119 mg/l | 331 | 815 | 1 |
| 269 | 787 | 7/91 | 7 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0176 mg/l | 332 | 1254 | 1 |
| 270 | 788 | 7/91 | 7 | 8 | 91 | Hg | M | 0.0013 mg/l | 0.0100 mg/l | 00333–334 | 669 | 1 |
| 271 | 789 | 7/91 | 7 | 9 | 91 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 335 | 62 | 1 |
| 272 | 790 | 7/91 | 7 | 10 | 91 | Hg | M | 0.0013 mg/l | 0.0035 mg/l | 336 | 169 | 1 |
| 273 | 791 | 7/91 | 7 | 11 | 91 | Hg | M | 0.0013 mg/l | 0.0082 mg/l | 337 | 531 | 1 |
| 274 | 792 | 7/91 | 7 | 12 | 91 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 338 | 92 | 1 |
| 275 | 793 | 7/91 | 7 | 13 | 91 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 339 | 192 | 1 |
| 276 | 794 | 7/91 | 7 | 14 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 340 | 8 | 1 |
| 277 | 795 | 7/91 | 7 | 19 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 341 | 54 | 1 |
| 278 | 796 | 7/91 | 7 | 21 | 91 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 342 | 138 | 1 |
| 279 | 797 | 7/91 | 7 | 22 | 91 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 343 | 123 | 1 |
| 280 | 800 | 8/91 | 8 | 10 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 344 | 8 | 1 |
| 281 | 801 | 8/91 | 8 | 15 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 345 | 23 | 1 |
| 282 | 802 | 8/91 | 8 | 17 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 346 | 54 | 1 |
| 283 | 803 | 8/91 | 8 | 23 | 91 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 347 | 46 | 1 |
| 284 | 804 | 8/91 | 8 | 27 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 348 | 15 | 1 |
| 285 | 805 | 8/91 | 8 | 29 | 91 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 349 | 69 | 1 |
| 286 | 810 | 9/91 | 9 | 13 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 350 | 38 | 1 |
| 287 | 811 | 9/91 | 9 | 14 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 351 | 15 | 1 |
| 288 | 812 | 9/91 | 9 | 15 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 352 | 38 | 1 |

618

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | | | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 289 | 813 | 9/91 | 9 | 16 | 91 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 353 | 77 | 1 |
| 290 | 814 | 9/91 | 9 | 17 | 91 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 354 | 115 | 1 |
| 291 | 815 | 9/91 | 9 | 18 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 355 | 38 | 1 |
| 292 | 816 | 9/91 | 9 | 19 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 356 | 15 | 1 |
| 293 | 817 | 9/91 | 9 | 20 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 357 | 15 | 1 |
| 294 | 818 | 9/91 | 9 | 22 | 91 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 358 | 85 | 1 |
| 295 | 819 | 9/91 | 9 | 23 | 91 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 359 | 115 | 1 |
| 296 | 820 | 9/91 | 9 | 24 | 91 | Hg | M | 0.0013 mg/l | 0.0037 mg/l | 360 | 185 | 1 |
| 297 | 821 | 9/91 | 9 | 25 | 91 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 361 | 123 | 1 |
| 298 | 822 | 9/91 | 9 | 26 | 91 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 362 | 77 | 1 |
| 299 | 823 | 9/91 | 9 | 29 | 91 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 363 | 69 | 1 |
| 300 | 824 | 9/91 | 9 | 30 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 364 | 38 | 1 |
| 301 | 827 | 10/91 | 10 | 1 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 365 | 8 | 1 |
| 302 | 828 | 10/91 | 10 | 4 | 91 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 366 | 69 | 1 |
| 303 | 829 | 10/91 | 10 | 5 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 367 | 15 | 1 |
| 304 | 830 | 10/91 | 10 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 368 | 54 | 1 |
| 305 | 831 | 10/91 | 10 | 8 | 91 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 369 | 85 | 1 |
| 306 | 832 | 10/91 | 10 | 10 | 91 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 370 | 46 | 1 |
| 307 | 833 | 10/91 | 10 | 11 | 91 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 371 | 31 | 1 |
| 308 | 834 | 10/91 | 10 | 12 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 372 | 54 | 1 |
| 309 | 835 | 10/91 | 10 | 13 | 91 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 373 | 69 | 1 |
| 310 | 836 | 10/91 | 10 | 14 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 374 | 8 | 1 |
| 311 | 837 | 10/91 | 10 | 15 | 91 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 375 | 31 | 1 |
| 312 | 838 | 10/91 | 10 | 16 | 91 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 376 | 215 | 1 |
| 313 | 839 | 10/91 | 10 | 17 | 91 | Hg | M | 0.0013 mg/l | 0.0103 mg/l | 377 | 692 | 1 |
| 314 | 840 | 10/91 | 10 | 18 | 91 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 378 | 85 | 1 |
| 315 | 841 | 10/91 | 10 | 19 | 91 | Hg | M | 0.0013 mg/l | 0.0065 mg/l | 379 | 400 | 1 |
| 316 | 842 | 10/91 | 10 | 20 | 91 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 380 | 85 | 1 |
| 317 | 843 | 10/91 | 10 | 21 | 91 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 381 | 192 | 1 |
| 318 | 844 | 10/91 | 10 | 22 | 91 | Hg | M | 0.0013 mg/l | 0.0049 mg/l | 382 | 277 | 1 |
| 319 | 845 | 10/91 | 10 | 23 | 91 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 383 | 108 | 1 |
| 320 | 846 | 10/91 | 10 | 24 | 91 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 384 | 215 | 1 |
| 321 | 847 | 10/91 | 10 | 25 | 91 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 385 | 131 | 1 |
| 322 | 848 | 10/91 | 10 | 26 | 91 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 386 | 77 | 1 |
| 323 | 849 | 10/91 | 10 | 27 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 387 | 38 | 1 |
| 324 | 850 | 10/91 | 10 | 31 | 91 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 388 | 138 | 1 |
| 325 | 853 | 11/91 | 11 | 3 | 91 | Hg | M | 0.0013 mg/l | 0.0048 mg/l | 389 | 269 | 1 |
| 326 | 854 | 11/91 | 11 | 4 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 390 | 54 | 1 |
| 327 | 855 | 11/91 | 11 | 5 | 91 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 391 | 162 | 1 |
| 328 | 856 | 11/91 | 11 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0046 mg/l | 392 | 254 | 1 |
| 329 | 857 | 11/91 | 11 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 393 | 100 | 1 |
| 330 | 858 | 11/91 | 11 | 8 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 394 | 23 | 1 |
| 331 | 859 | 11/91 | 11 | 9 | 91 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 395 | 77 | 1 |
| 332 | 860 | 11/91 | 11 | 10 | 91 | Hg | M | 0.0013 mg/l | 0.0043 mg/l | 396 | 231 | 1 |
| 333 | 861 | 11/91 | 11 | 11 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 397 | 8 | 1 |
| 334 | 862 | 11/91 | 11 | 12 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 398 | 38 | 1 |
| 335 | 863 | 11/91 | 11 | 24 | 91 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 399 | 108 | 1 |
| 336 | 864 | 11/91 | 11 | 30 | 91 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 400 | 54 | 1 |
| 337 | 867 | 12/91 | 12 | 2 | 91 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 401 | 154 | 1 |
| 338 | 868 | 12/91 | 12 | 3 | 91 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 402 | 108 | 1 |
| 339 | 869 | 12/91 | 12 | 4 | 91 | Hg | M | 0.0013 mg/l | 0.0075 mg/l | 403 | 477 | 1 |
| 340 | 870 | 12/91 | 12 | 5 | 91 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 404 | 154 | 1 |
| 341 | 871 | 12/91 | 12 | 6 | 91 | Hg | M | 0.0013 mg/l | 0.0076 mg/l | 405 | 485 | 1 |
| 342 | 872 | 12/91 | 12 | 7 | 91 | Hg | M | 0.0013 mg/l | 0.0037 mg/l | 406 | 185 | 1 |
| 343 | 873 | 12/91 | 12 | 8 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 407 | 8 | 1 |
| 344 | 874 | 12/91 | 12 | 9 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 408 | 23 | 1 |
| 345 | 875 | 12/91 | 12 | 11 | 91 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 409 | 85 | 1 |
| 346 | 876 | 12/91 | 12 | 12 | 91 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 410 | 8 | 1 |

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | | | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 347 | 877 | 12/91 | 12 | 13 | 91 | Hg | M | 0.0013 mg/l | 0.0062 mg/l | 411 | 377 | 1 |
| 348 | 878 | 12/91 | 12 | 15 | 91 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 412 | 62 | 1 |
| 349 | 879 | 12/91 | 12 | 16 | 91 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 413 | 100 | 1 |
| 350 | 880 | 12/91 | 12 | 17 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 414 | 15 | 1 |
| 351 | 881 | 12/91 | 12 | 18 | 91 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 415 | 38 | 1 |
| 352 | 882 | 12/91 | 12 | 19 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 416 | 15 | 1 |
| 353 | 883 | 12/91 | 12 | 20 | 91 | Hg | M | 0.0013 mg/l | 0.0035 mg/l | 417 | 169 | 1 |
| 354 | 884 | 12/91 | 12 | 21 | 91 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 418 | 123 | 1 |
| 355 | 885 | 12/91 | 12 | 22 | 91 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 419 | 23 | 1 |
| 356 | 886 | 12/91 | 12 | 23 | 91 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 420 | 108 | 1 |
| 357 | 887 | 12/91 | 12 | 24 | 91 | Hg | M | 0.0013 mg/l | 0.0180 mg/l | 421 | 1285 | 1 |
| 358 | 888 | 12/91 | 12 | 25 | 91 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 422 | 92 | 1 |
| 359 | 889 | 12/91 | 12 | 26 | 91 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 423 | 15 | 1 |
| 360 | 890 | 12/91 | 12 | 27 | 91 | Hg | M | 0.0013 mg/l | 0.0072 mg/l | 424 | 454 | 1 |
| 361 | 891 | 12/91 | 12 | 29 | 91 | Hg | M | .0.0013 mg/l | 0.0212 mg/l | 425 | 1531 | 1 |
| 362 | 892 | 12/91 | 12 | 30 | 91 | Hg | M | 0.0013 mg/l | 0.0188 mg/l | 426 | 1346 | 1 |
| 363 | 893 | 12/91 | 12 | 31 | 91 | Hg | M | 0.0013 mg/l | 0.0147 mg/l | 427 | 1031 | 1 |
| 364 | 896 | 1/92 | 1 | 1 | 92 | Hg | M | 0.0013 mg/l | 0.0120 mg/l | 428 | 823 | 1 |
| 365 | 897 | 1/92 | 1 | 2 | 92 | Hg | M | 0.0013 mg/l | 0.0091 mg/l | 429 | 600 | 1 |
| 366 | 898 | 1/92 | 1 | 3 | 92 | Hg | M | 0.0013 mg/l | 0.0084 mg/l | 430 | 546 | 1 |
| 367 | 899 | 1/92 | 1 | 4 | 92 | Hg | M | 0.0013 mg/l | 0.0076 mg/l | 431 | 485 | 1 |
| 368 | 900 | 1/92 | 1 | 5 | 92 | Hg | M | 0.0013 mg/l | 0.0060 mg/l | 432 | 362 | 1 |
| 369 | 901 | 1/92 | 1 | 6 | 92 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 433 | 131 | 1 |
| 370 | 902 | 1/92 | 1 | 7 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 434 | 85 | 1 |
| 371 | 903 | 1/92 | 1 | 8 | 92 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 435 | 115 | 1 |
| 372 | 904 | 1/92 | 1 | 16 | 92 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 436 | 115 | 1 |
| 373 | 905 | 1/92 | 1 | 17 | 92 | Hg | M | 0.0013 mg/l | 0.0050 mg/l | 437 | 285 | 1 |
| 374 | 906 | 1/92 | 1 | 18 | 92 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 438 | 31 | 1 |
| 375 | 907 | 1/92 | 1 | 19 | 92 | Hg | M | 0.0013 mg/l | 0.0049 mg/l | 439 | 277 | 1 |
| 376 | 908 | 1/92 | 1 | 20 | 92 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 440 | 115 | 1 |
| 377 | 909 | 1/92 | 1 | 21 | 92 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 441 | 23 | 1 |
| 378 | 910 | 1/92 | 1 | 22 | 92 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 442 | 92 | 1 |
| 379 | 911 | 1/92 | 1 | 24 | 92 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 443 | 8 | 1 |
| 380 | 912 | 1/92 | 1 | 31 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 444 | 85 | 1 |
| 381 | 915 | 2/92 | 2 | 1 | 92 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 445 | 208 | 1 |
| 382 | 916 | 2/92 | 2 | 2 | 92 | Hg | M | 0.0013 mg/l | 0.0052 mg/l | 446 | 300 | 1 |
| 383 | 917 | 2/92 | 2 | 3 | 92 | Hg | M | 0.0013 mg/l | 0.0039 mg/l | 447 | 200 | 1 |
| 384 | 918 | 2/92 | 2 | 4 | 92 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 448 | 15 | 1 |
| 385 | 919 | 2/92 | 2 | 7 | 92 | Hg | M | 0.0013 mg/l | 0.0036 mg/l | 449 | 177 | 1 |
| 386 | 920 | 2/92 | 2 | 8 | 92 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 450 | 138 | 1 |
| 387 | 921 | 2/92 | 2 | 9 | 92 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 451 | 46 | 1 |
| 388 | 922 | 2/92 | 2 | 13 | 92 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 452 | 162 | 1 |
| 389 | 923 | 2/92 | 2 | 14 | 92 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 453 | 154 | 1 |
| 390 | 924 | 2/92 | 2 | 19 | 92 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 454 | 77 | 1 |
| 391 | 925 | 2/92 | 2 | 21 | 92 | Hg | M | 0.0013 mg/l | 0.0029 mg/l | 455 | 123 | 1 |
| 392 | 926 | 2/92 | 2 | 22 | 92 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 456 | 8 | 1 |
| 393 | 927 | 2/92 | 2 | 27 | 92 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 457 | 115 | 1 |
| 394 | 928 | 2/92 | 2 | 28 | 92 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 458 | 162 | 1 |
| 395 | 929 | 2/92 | 2 | 29 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 459 | 85 | 1 |
| 396 | 932 | 3/92 | 3 | 2 | 92 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 460 | 15 | 1 |
| 397 | 933 | 3/92 | 3 | 3 | 92 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 461 | 62 | 1 |
| 398 | 934 | 3/92 | 3 | 4 | 92 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 462 | 46 | 1 |
| 399 | 935 | 3/92 | 3 | 5 | 92 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 463 | 8 | 1 |
| 400 | 936 | 3/92 | 3 | 6 | 92 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 464 | 69 | 1 |
| 401 | 937 | 3/92 | 3 | 7 | 92 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 465 | 92 | 1 |
| 402 | 938 | 3/92 | 3 | 10 | 92 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 466 | 69 | 1 |
| 403 | 939 | 3/92 | 3 | 11 | 92 | Hg | M | 0.0013 mg/l | 0.0042 mg/l | 467 | 223 | 1 |
| 404 | 940 | 3/92 | 3 | 12 | 92 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 468 | 208 | 1 |

620

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M | D | Y | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 405 | 941 | 3/92 | 3 | 13 | 92 | Hg | M | 0.0013 mg/l | 0.0042 mg/l | 469 | 223 | 1 |
| 406 | 942 | 3/92 | 3 | 14 | 92 | Hg | M | 0.0013 mg/l | 0.0067 mg/l | 470 | 415 | 1 |
| 407 | 943 | 3/92 | 3 | 15 | 92 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 471 | 215 | 1 |
| 408 | 944 | 3/92 | 3 | 16 | 92 | Hg | M | 0.0013 mg/l | 0.0056 mg/l | 472 | 331 | 1 |
| 409 | 945 | 3/92 | 3 | 17 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 473 | 85 | 1 |
| 410 | 946 | 3/92 | 3 | 18 | 92 | Hg | M | 0.0013 mg/l | 0.0055 mg/l | 474 | 323 | 1 |
| 411 | 947 | 3/92 | 3 | 20 | 92 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 475 | 162 | 1 |
| 412 | 948 | 3/92 | 3 | 21 | 92 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 476 | 15 | 1 |
| 413 | 949 | 3/92 | 3 | 22 | 92 | Hg | M | 0.0013 mg/l | 0.0020 mg/l | 477 | 54 | 1 |
| 414 | 950 | 3/92 | 3 | 23 | 92 | Hg | M | 0.0013 mg/l | 0.0036 mg/l | 478 | 177 | 1 |
| 415 | 951 | 3/92 | 3 | 24 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 479 | 85 | 1 |
| 416 | 952 | 3/92 | 3 | 25 | 92 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 480 | 162 | 1 |
| 417 | 953 | 3/92 | 3 | 26 | 92 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 481 | 92 | 1 |
| 418 | 954 | 3/92 | 3 | 27 | 92 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 482 | 215 | 1 |
| 419 | 955 | 3/92 | 3 | 28 | 92 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 483 | 138 | 1 |
| 420 | 956 | 3/92 | 3 | 29 | 92 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 484 | 38 | 1 |
| 421 | 957 | 3/92 | 3 | 30 | 92 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 485 | 131 | 1 |
| 422 | 958 | 3/92 | 3 | 31 | 92 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 486 | 131 | 1 |
| 423 | 961 | 4/92 | 4 | 1 | 92 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 487 | 115 | 1 |
| 424 | 962 | 4/92 | 4 | 2 | 92 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 488 | 162 | 1 |
| 425 | 963 | 4/92 | 4 | 3 | 92 | Hg | M | 0.0013 mg/l | 0.0030 mg/l | 489 | 131 | 1 |
| 426 | 964 | 4/92 | 4 | 4 | 92 | Hg | M | 0.0013 mg/l | 0.0041 mg/l | 490 | 215 | 1 |
| 427 | 965 | 4/92 | 4 | 5 | 92 | Hg | M | 0.0013 mg/l | 0.0040 mg/l | 491 | 208 | 1 |
| 428 | 966 | 4/92 | 4 | 6 | 92 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 492 | 138 | 1 |
| 429 | 967 | 4/92 | 4 | 7 | 92 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 493 | 100 | 1 |
| 430 | 968 | 4/92 | 4 | 8 | 92 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 494 | 115 | 1 |
| 431 | 969 | 4/92 | 4 | 9 | 92 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 495 | 108 | 1 |
| 432 | 970 | 4/92 | 4 | 10 | 92 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 496 | 92 | 1 |
| 433 | 971 | 4/92 | 4 | 11 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 497 | 85 | 1 |
| 434 | 972 | 4/92 | 4 | 12 | 92 | Hg | M | 0.0013 mg/l | 0.0057 mg/l | 498 | 338 | 1 |
| 435 | 973 | 4/92 | 4 | 13 | 92 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 499 | 162 | 1 |
| 436 | 974 | 4/92 | 4 | 14 | 92 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 500 | 62 | 1 |
| 437 | 975 | 4/92 | 4 | 15 | 92 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 501 | 138 | 1 |
| 438 | 976 | 4/92 | 4 | 16 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 502 | 85 | 1 |
| 439 | 977 | 4/92 | 4 | 17 | 92 | Hg | M | 0.0013 mg/l | 0.0021 mg/l | 503 | 62 | 1 |
| 440 | 978 | 4/92 | 4 | 18 | 92 | Hg | M | 0.0013 mg/l | 0.0028 mg/l | 504 | 115 | 1 |
| 441 | 979 | 4/92 | 4 | 19 | 92 | Hg | M | 0.0013 mg/l | 0.0035 mg/l | 505 | 169 | 1 |
| 442 | 980 | 4/92 | 4 | 20 | 92 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 506 | 108 | 1 |
| 443 | 981 | 4/92 | 4 | 21 | 92 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 508 | 77 | 1 |
| 444 | 982 | 4/92 | 4 | 22 | 92 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 509 | 100 | 1 |
| 445 | 983 | 4/92 | 4 | 23 | 92 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 510 | 154 | 1 |
| 446 | 984 | 4/92 | 4 | 24 | 92 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 511 | 92 | 1 |
| 447 | 985 | 4/92 | 4 | 25 | 92 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 512 | 23 | 1 |
| 448 | 986 | 4/92 | 4 | 27 | 92 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 513 | 15 | 1 |
| 449 | 987 | 4/92 | 4 | 28 | 92 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 514 | 69 | 1 |
| 450 | 988 | 4/92 | 4 | 29 | 92 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 515 | 108 | 1 |
| 451 | 989 | 4/92 | 4 | 30 | 92 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 516 | 38 | 1 |
| 452 | 990 | 5/92 | 5 | 1 | 92 | Hg | M | 0.0013 mg/l | 0.0034 mg/l | 517 | 162 | 1 |
| 453 | 991 | 5/92 | 5 | 2 | 92 | Hg | M | 0.0013 mg/l | 0.0025 mg/l | 518 | 92 | 1 |
| 454 | 992 | 5/92 | 5 | 3 | 92 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 519 | 100 | 1 |
| 455 | 993 | 5/92 | 5 | 4 | 92 | Hg | M | 0.0013 mg/l | 0.0022 mg/l | 520 | 69 | 1 |
| 456 | 994 | 5/92 | 5 | 5 | 92 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 521 | 46 | 1 |
| 457 | 995 | 5/92 | 5 | 6 | 92 | Hg | M | 0.0013 mg/l | 0.0036 mg/l | 522 | 177 | 1 |
| 458 | 996 | 5/92 | 5 | 7 | 92 | Hg | M | 0.0013 mg/l | 0.0036 mg/l | 523 | 177 | 1 |
| 459 | 997 | 5/92 | 5 | 8 | 92 | Hg | M | 0.0013 mg/l | 0.0039 mg/l | 524 | 200 | 1 |
| 460 | 998 | 5/92 | 5 | 12 | 92 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 525 | 192 | 1 |
| 461 | 999 | 5/92 | 5 | 13 | 92 | Hg | M | 0.0013 mg/l | 0.0033 mg/l | 526 | 154 | 1 |
| 462 | 1000 | 5/92 | 5 | 19 | 92 | Hg | M | 0.0013 mg/l | 0.0190 mg/l | 527 | 1362 | 1 |

| [1] New Violation # | [2] Old Violation # | [3] DMR Period | [4] Date of Violation M D Y | | | [5] Parameter | Type | [6] Permit Limit Amount Units | [7] Measured Value Amount Units | [8] Certificate of Analysis Bates # | [9] % Over Limit | [10] Number of Violations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 463 | 1001 | 5/92 | 5 | 20 | 92 | Hg | M | 0.0013 mg/l | 0.0068 mg/l | 528 | 423 | 1 |
| 464 | 1002 | 5/92 | 5 | 21 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 529 | 85 | 1 |
| 465 | 1003 | 5/92 | 5 | 22 | 92 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 530 | 15 | 1 |
| 466 | 1004 | 5/92 | 5 | 24 | 92 | Hg | M | 0.0013 mg/l | 0.0024 mg/l | 531 | 85 | 1 |
| 467 | 1007 | 6/92 | 6 | 2 | 92 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 538 | 108 | 1 |
| 468 | 1008 | 6/92 | 6 | 4 | 92 | Hg | M | 0.0013 mg/l | 0.0026 mg/l | 539 | 100 | 1 |
| 469 | 1009 | 6/92 | 6 | 5 | 92 | Hg | M | 0.0013 mg/l | 0.0032 mg/l | 540 | 146 | 1 |
| 470 | 1010 | 6/92 | 6 | 6 | 92 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 541 | 138 | 1 |
| 471 | 1011 | 6/92 | 6 | 7 | 92 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 542 | 192 | 1 |
| 472 | 1012 | 6/92 | 6 | 8 | 92 | Hg | M | 0.0013 mg/l | 0.0054 mg/l | 543 | 315 | 1 |
| 473 | 1013 | 6/92 | 6 | 9 | 92 | Hg | M | 0.0013 mg/l | 0.0160 mg/l | 544 | 1131 | 1 |
| 474 | 1014 | 6/92 | 6 | 10 | 92 | Hg | M | 0.0013 mg/l | 0.0038 mg/l | 545 | 192 | 1 |
| 475 | 1015 | 6/92 | 6 | 11 | 92 | Hg | M | 0.0013 mg/l | 0.0031 mg/l | 546 | 138 | 1 |
| 476 | 1016 | 6/92 | 6 | 12 | 92 | Hg | M | 0.0013 mg/l | 0.0064 mg/l | 547 | 392 | 1 |
| 477 | 1017 | 6/92 | 6 | 15 | 92 | Hg | M | 0.0013 mg/l | 0.0162 mg/l | 548 | 1146 | 1 |
| 478 | 1018 | 6/92 | 6 | 16 | 92 | Hg | M | 0.0013 mg/l | 0.0108 mg/l | 549 | 731 | 1 |
| 479 | 1019 | 6/92 | 6 | 17 | 92 | Hg | M | 0.0013 mg/l | 0.0140 mg/l | 550 | 977 | 1 |
| 480 | 1020 | 6/92 | 6 | 18 | 92 | Hg | M | 0.0013 mg/l | 0.0145 mg/l | 551 | 1015 | 1 |
| 481 | 1035 | 7/92 | 7 | 8 | 92 | Hg | M | 0.0013 mg/l | 0.0015 mg/l | 532 | 15 | 1 |
| 482 | 1036 | 8/92 | 8 | 6 | 92 | Hg | M | 0.0013 mg/l | 0.0019 mg/l | 533 | 46 | 1 |
| 483 | 1037 | 8/92 | 8 | 7 | 92 | Hg | M | 0.0013 mg/l | 0.0023 mg/l | 534 | 77 | 1 |
| 484 | 1038 | 8/92 | 8 | 10 | 92 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 535 | 38 | 1 |
| 485 | 1039 | 10/92 | 10 | 5 | 92 | Hg | M | 0.0013 mg/l | 0.0014 mg/l | 536 | 8 | 1 |
| 486 | 1040 | 10/92 | 10 | 8 | 92 | Hg | M | 0.0013 mg/l | 0.0017 mg/l | 537 | 31 | 1 |
| 487 | 1046 | 11/94 | 11 | 3 | 94 | Hg | M | 0.0013 mg/l | 0.0027 mg/l | 552 | 108 | 1 |
| 488 | 1047 | 1/95 | 1 | 26 | 95 | Hg | M | 0.0013 mg/l | 0.0016 mg/l | 553 | 23 | 1 |
| 489 | 1048 | 3/93 | 3 | 30 | 93 | Hg | M | 0.0013 mg/l | 0.0018 mg/l | 900199 | 38 | 1 |

489

(1) For ease of reference, plaintiffs have numbered each of the violations listed in this exhibit.

(2) The entries in this column identify the old violation number.

(3) The entries in this column identify the discharge monitoring period in which the violation occurred.

(4) This column identifies the dates of defendant's violations by months (m), day(s) (d) and year (Y). Monthly violations are identified by month and year only.

(5) The entries in this column identify the parameters for which the defendant violated the discharge limitations in its NPDES permit. The following abbreviations have been used:

Hg Mercury

(6) The entries in this column identify the discharge limitations set forth in defendant's NPDES permit which were violated. The following abbreviations have been used:

M Maximum
mg/l milligrams/liter

(7) The entries in this column identify the measured value of defendant's discharge as set forth in its certificate of analysis.

(8) The entries in this column identify the Bates number of the defendant's certificate of analysis.

(9) The entries in this column identify the percent by which defendant's discharge of the pollutant exceeded the amount allowed by its NPDES permit.

(10) Violations of daily maximum discharge limitations are counted as 1 day of violation.

Appendix B
## Economic Benefit Calculations

| Penalty Items | Category | Economic Benefit as of Penalty Payment Date October 95 |
|---|---|---|
| 1 Neutralization System | Capital and O & M | $ 303,276 |
| 2 Lancy System | Capital and O & M | $ 1,744,000 |
| 3 Carbon Adsorption System | Capital and O & M | $ 232,756 |
| 4 Pre–Filter | Capital and O & M | $ 71,806 |
| 5 Gas Scrubber Study | One–Time | $ 15,824 |
| 6 Wastewater Study | One–Time | $ 25,164 |
| 7 ISCO Sampler | One–Time | $ 4,856 |
| 8 Miscellaneous One–Time Expenses | One–Time | $ 40,810 |

| Credit Items | | |
|---|---|---|
| 1 Ion Exchange System | Capital | ($ 48,584) |
| 2 Micro Filter (Piping Only) | Capital | ($ 21,100) |
| 3 Rental of Micro Filter Units | O & M | ($ 23,485) |
| 4 Rental of ISCO Sampler | O & M | ($ 5,529) |
| 5 Rental of Carbon Adsorption System | O & M | ($ 21,332) |
| 6 1992 Wastewater Disposal | O & M | ($ 24,009) |
| 7 Fish Tissue Study | One–Time | ($ 18,154) |
| 8 O & M Cost Savings | O & M | ($ 401,759) |
| 9 Lost Earnings from Incinerator Shutdown | One–Time | ($ 623,352) |
| | Subtotal Credit Items | ($ 1,187,304 |
| Payment to DHEC | One–Time | ($ 158,607) |
| **NET ECONOMIC BENEFIT** | | $ 1,092,581 |